[No. S124739. July 13, 2006.]

KELLY KEARNEY et al., Plaintiffs and Appellants, v.
SALOMON SMITH BARNEY, INC., Defendant and Respondent.

**COUNSEL**

Markun Zusman & Compton, David S. Markun, Edward S. Zusman and Kevin K. Eng for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, and Margaret Reiter, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, William F. Alderman and Alejandro Vallejo for Defendant and Respondent.

National Chamber Litigation Center, Robin S. Conrad, Stephanie A. Martz; Mayer, Brown, Row & Maw, Donald M. Falk and Fatima Goss Graves for the Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Respondent.

Deborah J. La Fetra and Timothy Sandefur for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**GEORGE, C. J.**—The complaint in this case alleges that employees at the Atlanta-based branch of defendant Salomon Smith Barney, Inc. (SSB)—a large, nationwide brokerage firm that has numerous offices and does extensive business in California—repeatedly have recorded telephone conversations with California clients without the clients' knowledge or consent. These facts give rise to a classic choice-of-law issue, because the relevant California privacy statute generally prohibits any person from recording a telephone conversation without the consent of *all* parties to the conversation, whereas the comparable Georgia statute does not prohibit the recording of a telephone conversation when the recording is made with the consent of *one* party to the conversation.

In this proceeding, several California clients of SSB filed a putative class action against SSB seeking to obtain injunctive relief against its Atlanta-based branch's continuing practice of recording telephone conversations, resulting from calls made to and from California, without knowledge or consent of the California clients, and also seeking to recover damages and/or restitution based upon recording that occurred in the past. SSB filed a demurrer to the complaint, maintaining that no relief is warranted, because the conduct of its Atlanta-based employees was and is permissible under Georgia law.

The trial court sustained SSB's demurrer and dismissed the action. The Court of Appeal affirmed the judgment rendered by the trial court, concluding that application of Georgia law is appropriate and supports the denial of all relief sought by plaintiffs. We granted review to consider the novel choice-of-law issue presented by this case.

Past decisions establish that in analyzing a choice-of-law issue, *California courts apply the so-called governmental interest analysis, under which a court carefully examines the governmental interests or purposes served by the applicable statute or rule of law of each of the affected jurisdictions to determine whether there is a "true conflict." If such a conflict is found to exist, the court analyzes the jurisdictions' respective interests to determine which jurisdiction's interests would be more severely impaired if that jurisdiction's law were not applied in the particular context presented by the case. (See, e.g., *Reich v. Purcell* (1967) 67 Cal.2d 551 [63 Cal.Rptr. 31, 432 P.2d 727]; *Hurtado v. Superior Court* (1974) 11 Cal.3d 574 [114 Cal.Rptr. 106, 522 P.2d 666]; *Bernhard v. Harrah's Club* (1976) 16 Cal.3d 313 [128 Cal.Rptr. 215, 546 P.2d 719]; *Offshore Rental Co. v. Continental Oil Co.* (1978) 22 Cal.3d 157 [148 Cal.Rptr. 867, 583 P.2d 721] (*Offshore Rental*).)

For the reasons discussed at length below, we conclude that this case presents a true conflict between California and Georgia law, and that, as a general matter, the failure to apply California law in this context would impair California's interest in protecting the degree of privacy afforded to California residents by California law more severely than the application of California law would impair any interests of the State of Georgia.

As we shall explain, in light of the substantial number of businesses operating in California that maintain out-of-state offices or telephone operators, a resolution of this conflict permitting all such businesses to regularly and routinely record telephone conversations made to or from California clients or consumers without the clients' or consumers' knowledge or consent would significantly impair the privacy policy guaranteed by California law, and potentially would place local California businesses (that would continue to be subject to California's protective privacy law) at an unfair competitive disadvantage vis-à-vis their out-of-state counterparts. At the same time, application of California law will not have a significant detrimental effect on Georgia's interests as embodied in the applicable Georgia law, because applying California law (1) will not adversely affect any privacy interest protected by Georgia law, (2) will affect only those business telephone calls in Georgia that are made to or are received from California clients, and (3) with respect to such calls, will not prevent a business located in Georgia from implementing or maintaining a practice of recording *all* such calls, but will require only that the business *inform* its clients or customers, at the outset of the call, of the company's policy of recording such calls. (As explained below, if a business informs a client or customer at the outset of a telephone call that the call is being recorded, the recording would not violate the applicable California statute.)

Although we conclude that the comparative impairment analysis supports the application of California law in this context, we further conclude that

because one of the goals of that analysis is "the 'maximum attainment of underlying purpose by *all* governmental entities' " (*Offshore Rental, supra,* 22 Cal.3d 157, 166, italics added), it is appropriate in this instance to apply California law in a restrained manner that accommodates Georgia's reasonable interest in protecting persons who *in the past* might have undertaken actions in Georgia in reasonable reliance on Georgia law from being subjected to monetary liability for such actions. Prior to our resolution of this case it would have been reasonable for a business entity such as SSB to be uncertain as to which state's law—Georgia's or California's—would be applicable in this context, and the denial of monetary recovery for past conduct that might have been undertaken in reliance upon another state's law is unlikely to undermine significantly the California interest embodied in the applicable invasion-of-privacy statutes. We therefore conclude that it is Georgia's, rather than California's, interest that would be more severely impaired were monetary liability to be imposed on SSB for such *past* conduct. Under these circumstances, we conclude it is appropriate to decline to impose damages upon SSB (or to require it to provide restitution) on the basis of such past conduct.

Accordingly, we conclude that plaintiffs' action should be permitted to go forward with respect to the request for injunctive relief, but that the judgment rendered by the Court of Appeal should be affirmed insofar as it upholds the dismissal of plaintiffs' claim for damages or restitution based on SSB's past conduct.

**I**

Because the trial court dismissed plaintiffs' action after sustaining a demurrer without leave to amend, for purposes of this appeal we assume the truth of all well-pleaded factual allegations of the complaint. (See, e.g., *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

According to the complaint, the named plaintiffs—Kelly Kearney and Mark Levy—are California residents who were employed in California by MFS Communications Company when that company was acquired in 1996 by WorldCom (a large nationwide telecommunications firm). After the acquisition, both plaintiffs continued to work for WorldCom in California and, during the course of their employment, both were granted stock options in WorldCom that could be exercised only through defendant SSB. The complaint alleges that in 1998, WorldCom's human relations department informed Levy that the Atlanta branch office of SSB handled financial matters for WorldCom employees, and that this department "directed" him to that branch office with regard to matters involving the exercise of his stock options. Both Levy and Kearney opened accounts with SSB's Atlanta office and, during the

course of their relationships with SSB, each plaintiff, while in California, made and received numerous telephone calls from individual brokers in the Atlanta office.

At some point, Kearney and Levy filed claims against SSB with the National Association of Securities Dealers, alleging that SSB and its individual brokers had engaged in "malfeasance, fraud, and breach of fiduciary duties" in providing advice to them. Apparently in the course of the litigation of those claims, Kearney and Levy learned that numerous telephone calls that were made and received by SSB's Atlanta office to and from California clients, while the clients were in California, were tape-recorded by SSB employees without the clients' knowledge or consent.

Kearney and Levy then filed the present action, seeking relief on their own behalf and on behalf of all other clients of SSB who resided in California and whose accounts were serviced by the Atlanta branch of SSB. The complaint alleged that during the course of their relationship with SSB, the named plaintiffs and other members of the class took part in numerous telephone conversations concerning their personal financial affairs, had an expectation of privacy in those communications, were unaware that their conversations were being recorded, and did not give consent to the recording of such conversations. The complaint further alleged that SSB intentionally recorded such conversations without disclosing that it was doing so.

The complaint maintained that the conduct of SSB alleged in the complaint provided a basis for a civil cause of action under section 637.2 of the Penal Code—a provision of California's invasion-of-privacy statutory scheme—as well as under section 17200 of the Business and Professions Code, a provision of California's unfair competition law that provides a civil remedy against (among other things) unlawful business practices. The complaint sought (1) injunctive relief to restrain SSB in the future "from using its practice/policy of illegally recording telephone conversations with its clients," and (2) damages and restitution based upon SSB's past conduct.

SSB filed a demurrer to the complaint, and after briefing and a hearing on the legal issues, the trial court sustained the demurrer without leave to amend, concluding that "under both Georgia and federal law recordings may lawfully be made in Georgia with one party's consent. As such, defendant's conduct cannot be viewed as unlawful or unfair or deceptive under California Business &

Professions § 17200. Further, any attempt to apply Penal Code § 632 to recordings made in Georgia would be preempted by federal law and violate the Commerce Clause."[1]

On appeal, the Court of Appeal—although noting that the parties had failed to identify or brief the correct legal issue (that is, the choice-of-law issue) in either the trial court or, initially, in the Court of Appeal—nonetheless affirmed the judgment rendered by the trial court, concluding "that, on the specific facts of this case, Georgia has the greater interest in having its law applied." The Court of Appeal was of the view that "[a]ny other result would bless a legalistic 'gotcha': the office of a financial services organization in a state which, like the majority of states, has a statute which permits it to record routine telephone calls to and from its clients without their specific consent is left at risk that a client in one of the minority of states that requires *both parties* [to] consent will sue it in the client's home state and attempt to apply that state's law."

As noted above, we granted plaintiffs' petition for review to address the novel choice-of-law-issue presented by this case.[2]

## II

Before addressing the choice-of-law issue, we believe it is useful to explain briefly why the numerous legal theories and authorities upon which SSB placed its initial reliance—and which SSB continues to advance in its briefing in this court—do not support the trial court's ruling sustaining SSB's demurrer without leave to amend.

To begin with, although SSB cites and relies upon a number of cases dealing with personal jurisdiction, it is clear there can be no constitutional objection to California's exercising personal jurisdiction over SSB by adjudicating this civil action in a California court. The complaint alleges that SSB "systematically and continually does business" in California, and SSB does not deny that it maintains numerous offices and does extensive business in this state. Furthermore, this action—involving SSB's alleged recording of

---

[1] As explained below, Penal Code section 637.5 authorizes a civil cause of action for any violation of the applicable invasion-of-privacy statutory scheme, and Penal Code section 632 is the specific provision of that scheme that governs the unlawful recording of telephone conversations. (See, *post*, at pp. 115–118.)

[2] While this matter was pending before this court, plaintiff Kearney requested to be dismissed from the action in light of a settlement agreement she had entered into with SSB. We granted the request, noting that the dismissal would not affect the viability of the action, because plaintiff Levy remains a named plaintiff and a putative class representative. We note also that in 2003, SSB formally changed its name to Citigroup Global Markets, Inc., but for purposes of this case we shall continue to refer to defendant as SSB.

telephone conversations relating to business transactions—plainly arises directly out of SSB's business activity in this state. Under these circumstances, SSB is clearly subject to the personal jurisdiction of California courts under both the "general" and "specific" categories of personal jurisdiction. (See, e.g., *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445–446 [58 Cal.Rptr.2d 899, 926 P.2d 1085].)

Second, contrary to SSB's strenuous argument, the application of California law in the setting of this case clearly would not exceed the constitutional limits imposed by the federal due process clause on a state's legislative jurisdiction, by seeking to impose California law on activities conducted outside of California as to which California has no legitimate or sufficient state interest. The present legal proceedings are based upon defendant business entity's alleged policy and practice of recording telephone calls of *California* clients, while the clients are *in California*, without the clients' knowledge or consent. California clearly has an interest—in protecting the privacy of telephone conversations of California residents while they are in California—sufficient to permit this state, as a constitutional matter, to exercise legislative jurisdiction over such activity. (See, for example, *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1391 [82 Cal.Rptr.2d 304] [California may regulate business's out-of-state "distant forum abuse" against California consumers]; *People v. Fairfax Family Fund, Inc.* (1964) 235 Cal.App.2d 881, 883–885 [47 Cal.Rptr. 812] [upholding application of California Small Loan Law to out-of-state company that solicited business in California by mail].) This is not a case in which California would be applying its law in order to alter a defendant's conduct in another state *vis-à-vis* another state's residents. (Cf. *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 572–573 [134 L.Ed.2d 809, 116 S.Ct. 1589] ["[B]y attempting to alter BMW's nationwide policy, Alabama would be infringing on the policy choices of other States. To avoid such encroachment, the economic penalties that a State such as Alabama inflicts on those who transgress its laws . . . must be supported by the State's interest in protecting its own consumers and its own economy"].) Instead, application of California law would be limited to the defendant's surreptitious or undisclosed recording of words spoken over the telephone by California residents while they are in California. This is a traditional setting in which a state may act to protect the interests of its own residents while in their home state. (See, e.g., *Watson v. Employers Liability Corp.* (1954) 348 U.S. 66, 72 [99 L.Ed. 74, 75 S.Ct. 166] [in upholding Louisiana's application of a Louisiana statute permitting an injured person to bring a "direct action" against an insurer doing business in Louisiana even though the insurance policy in question was issued in Massachusetts and contained a clause prohibiting direct actions, the United States Supreme Court explained: "As a consequence of the modern practice of conducting widespread business activities throughout the entire United

States, this Court has in a series of cases held that more states than one may seize hold of local activities which are part of multistate transactions and may regulate to protect interests of its own people, even though other phases of the same transactions might justify regulatory legislation in other states"].)

As is recognized by the cited cases—and numerous others—the federal system contemplates that individual states may adopt distinct policies to protect their own residents and generally may apply those policies to businesses that choose to conduct business within that state. (See, e.g., *Allstate Ins. Co. v. Hague* (1981) 449 U.S. 302, 317–318 [66 L.Ed.2d 521, 101 S.Ct. 633] (plur. opn. of Brennan, J.); *id.* at pp. 329–331 (conc. opn. of Stevens, J.); *id.* at pp. 337–338 (dis. opn. of Powell, J.); *Clay v. Sun Ins. Office, Ltd.* (1964) 377 U.S. 179, 181–182 [12 L.Ed.2d 229, 84 S.Ct. 1197].) It follows from this basic characteristic of our federal system that, at least as a general matter, a company that conducts business in numerous states ordinarily is required to make itself aware of and comply with the law of a state in which it chooses to do business. As is demonstrated by the above cases, a state generally does not exceed its constitutional authority when it applies its law in such a setting, even if the law may implicate some action or failure to act that occurs outside the state.

Third, contrary to SSB's contention and the conclusion of the trial court, past decisions establish that although SSB's alleged conduct would not violate the provisions of the applicable federal law relating to the recording of telephone conversations (18 U.S.C. § 2511(2)(d)), federal law does not preempt the application of California's more protective privacy provisions.

In *People v. Conklin* (1974) 12 Cal.3d 259, 270–273 [114 Cal.Rptr. 241, 522 P.2d 1049], this court specifically addressed the question whether the provisions of title III of the federal Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510–2520, hereafter title III)—relating to the wiretapping or recording of telephone conversations—preempted the application of the more stringent provisions embodied in California's invasion-of-privacy law. Reviewing the legislative history of title III, the court in *Conklin* determined that "Congress intended that the states be allowed to enact more restrictive laws designed to protect the right of privacy" (12 Cal.3d at p. 271), pointing out that a legislative committee report prepared in conjunction with the consideration of title III specifically observed that " '[t]he proposed provision envisions that States would be free to adopt *more restrictive* legislation, or no legislation at all, but not less restrictive legislation.' " (12 Cal.3d at p. 272.) Accordingly, the court in *Conklin* rejected the preemption claim.

Although an amicus curiae brief in the present case urges that the decision in *Conklin* be reconsidered (see amicus curiae brief of U.S. Chamber of

Commerce, pp. 20–23), the brief fails to point to any developments in the almost four decades since *Conklin* that would warrant such reconsideration, and omits reference to the numerous sister-state and federal decisions that have reached the same conclusion as *Conklin* with regard to the preemption issue. (See, e.g., *Roberts v. Americable Intern. Inc.* (E.D.Cal. 1995) 883 F.Supp. 499, 503, fn. 6; *United States v. Curreri* (D.Md. 1974) 388 F.Supp. 607, 613; *Bishop v. State* (1999) 241 Ga.App. 517 [526 S.E.2d 917, 920]; *People v. Pascarella* (1981) 92 Ill.App.3d 413 [48 Ill.Dec. 1, 415 N.E.2d 1285, 1287]; see also *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 810 [160 Cal.Rptr. 471].) Indeed, the Georgia privacy statute that we shall examine below is itself in some respects more restrictive than the applicable federal provision, and Georgia—like this court in *Conklin*—specifically has rejected the argument that the federal statute precludes a state from adopting a policy more protective of privacy than the policy established by federal law. (*Bishop v. State, supra,* 526 S.E.2d 917, 920–921.) Accordingly, there is no basis for concluding that application of California law is preempted by federal law.[3]

Fourth and finally, application of California law in this setting would not, at least on its face, constitute a violation of the federal commerce clause. (U.S. Const., art. I, § 8, cl. 3.) In advancing the contrary claim, SSB relies heavily on language in the United States Supreme Court's decision in *Healy v. The Beer Institute* (1989) 491 U.S. 324, 336 [105 L.Ed.2d 275, 109 S.Ct. 2491], to the effect that "the 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.' " The quotation from *Healy* is inapplicable not only because the occurrences here at issue quite clearly did not take place "wholly outside of [California's]

---

[3] In conjunction with its federal preemption argument, SSB contends that in some instances federal law *requires* the kind of recording of telephone conversations that allegedly occurred at SSB's Atlanta branch, citing rule 3010 of the National Association of Securities Dealers (NASD). That rule requires firms that are members of the NASD and that employ a significant number of representatives who previously worked at firms that have been disciplined by the NASD to tape-record *all* telephone conversations between their representatives and existing and potential customers. Although SSB acknowledges that it is not subject to rule 3010, it argues that this rule demonstrates that, at least in some circumstances, the California statute is incompatible with federal law.

SSB, however, fails to point to anything in NASD rule 3010 that would preclude a firm that is subject to this rule from informing an existing or potential client, at the outset of a conversation, that the telephone call is being recorded for business purposes. As explained below, a business can comply with the applicable California statute by providing such information at the outset of a telephone conversation so that the client or customer will not have a reasonable expectation that the conversation is not being recorded. Indeed, plaintiffs point to a notice that NASD issued in 1998 in relation to its rule 3010, stating that "[t]he best practice in each case would be for member firms to notify their registered persons and customers that their telephone calls are being tape recorded." (NASD Notice to Members, 98-52, p. 394.)

borders," but also because SSB's argument ignores the remainder of the quoted sentence from *Healy*, which goes on to state: "and, specifically, a State may not adopt legislation that has the practical effect of establishing 'a scale of prices for use in other states.' " (491 U.S. at p. 336.) As the entirety of the quoted sentence suggests, the decision in *Healy* addressed the validity of a state statute that purported to regulate a business entity's pricing practices in the forum state with reference to the prices charged by the entity in other states, and found the statute violative of the commerce clause because of the inevitable effect that the statute would have on the prices charged by the entity in its sales to residents in other states.

On its face, application of the California law here at issue would affect only a business's undisclosed recording of telephone conversations with clients or consumers in California and would not compel any action or conduct of the business with regard to conversations with non-California clients or consumers. (Compare *Edgar v. MITE Corp.* (1982) 457 U.S. 624, 644 [73 L.Ed.2d 269, 102 S.Ct. 2629] [in invalidating an Illinois statute that effectively authorized Illinois to determine whether a nationwide tender offer could proceed anywhere, the court observed that "[w]hile protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders"].) Although SSB may attempt to demonstrate, at a later stage in the litigation, that application of the California statute would pose an undue and excessive burden on interstate commerce by establishing that it would be impossible or infeasible for SSB to comply with the California statute without altering its conduct with regard to its non-California clients and that the burden that would be imposed upon it "is clearly excessive in relation to the putative local benefits" (*Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 90 S.Ct. 844]), SSB clearly cannot prevail on such a theory at the demurrer stage of the proceeding.

Accordingly, we believe that the only substantial issue presented by the case is the choice-of-law issue. We turn to that issue.

## III

■ Beginning with Chief Justice Traynor's seminal decision for this court in *Reich v. Purcell, supra,* 67 Cal.2d 551 (hereafter *Reich*), California has applied the so-called governmental interest analysis in resolving choice-of-law issues. In brief outline, the governmental interest approach generally involves three steps. First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under

the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" (*Bernhard v. Harrah's Club, supra,* 16 Cal.3d 313, 320), and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied." (*Ibid.*)

A review of several of the leading decisions of this court applying the governmental interest analysis illustrates how this approach actually operates in practice.

## A

In *Reich, supra,* 67 Cal.2d 551, for example, the plaintiffs filed a wrongful death action in California as a result of an automobile accident that occurred in Missouri. One of the cars involved in the accident was owned and operated by the defendant (Purcell), who was a California resident. The other car was owned and operated by Mrs. Reich, an Ohio resident, who was traveling with her two children. Mrs. Reich and one of her children were killed in the accident; the other child was injured. After the accident, Mr. Reich and his surviving child moved to California and then brought the wrongful death action against Purcell. The issue in the case related to the damages that the plaintiffs could recover in their wrongful death action.

In this setting there were three potentially affected jurisdictions—Missouri, Ohio, and California. Missouri law limited the recovery of damages in wrongful death actions to $25,000; by contrast, neither Ohio law nor California law placed a dollar limit on recovery in such actions. The trial court in that case held that Missouri law applied because the accident had occurred in that state, and limited the plaintiffs' recovery to $25,000. On appeal, however, this court rejected the prior "law of the place of the wrong" rule as the appropriate choice-of-law analysis, and instead adopted in its place the governmental interest analysis. (*Reich, supra,* 67 Cal.2d at pp. 553, 554, 555.)

In applying that analysis to the facts before it, the court in *Reich, supra,* 67 Cal.2d 551, initially concluded that California had no interest in applying its law, because the plaintiffs had not been California residents at the time of the accident and because inasmuch as California law did not limit damages it had no particular interest in applying its law to the defendant. In considering the respective interests of Missouri and Ohio, the court observed that although Missouri's limitation on damages in wrongful death actions expressed a

concern for avoiding the imposition of excessive financial burdens on the defendants, that concern was primarily a local concern. The court explained that it failed "to perceive any substantial interest Missouri might have in extending the benefits of its limitation of damages to travelers from states having no similar limitation. Defendant's liability should not be limited when no party to the action is from a state limiting liability and when defendant, therefore, would have secured insurance, if any, without any such limit in mind. . . . Under these circumstances giving effect to Ohio's interest in affording full recovery to injured parties does not conflict with any substantial interest of Missouri." (67 Cal.2d at p. 556.) Because the court found that Ohio had a substantial interest in having its law applied while Missouri did not, the case did not present a true conflict, and the court had little trouble determining that Ohio law should apply in that case with regard to the amount of damages recoverable in a wrongful death action. (*Id.* at pp. 556–557.)

**B**

*Hurtado v. Superior Court, supra,* 11 Cal.3d 574 (hereafter *Hurtado*), presented an issue and a fact pattern comparable to those presented in *Reich, supra,* 67 Cal.2d 551, and afforded our court an opportunity to provide further guidance on the appropriate mode of analysis under the governmental interest approach that had been adopted in *Reich, supra,* 67 Cal.2d 551. In *Hurtado,* as in *Reich,* the specific question at issue was the amount of damages recoverable in a wrongful death action that had been filed in a California court. In *Hurtado,* the plaintiffs in the wrongful death action—as well as the decedent—were residents of Mexico at the time of the accident, but the accident that had resulted in the decedent's death occurred in California, each of the defendant drivers was a California driver, and all the vehicles were registered in California. The two potentially affected jurisdictions were Mexico and California, and the question before the court was which jurisdiction's law should determine the amount of damages recoverable by the plaintiffs.

In analyzing the issue, the court first examined the law of each of the jurisdictions and found that whereas Mexico limited the amount survivors could recover in a wrongful death action (to 24,334 pesos), California placed no dollar limit on the damages that could be recovered in such an action. In continuing its analysis under the governmental interest approach, the court in *Hurtado* observed that "[a]lthough the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied." (*Hurtado, supra,* 11 Cal.3d at p. 580.) The court then found that in the setting of that case, Mexico did not have an interest in having its law applied,

explaining that "[t]he interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims" (*id.* at pp. 580–581) and that "this interest 'to avoid the imposition of excessive financial burdens on [defendants] . . . is . . . primarily local[,]' [citations]; that is, a state by enacting a limitation on damages is seeking to protect its residents from the imposition of these excessive financial burdens. Such a policy 'does not reflect a preference that widows and orphans should be denied full recovery.' [Citation.] Since it is the plaintiffs and not the defendants who are the Mexican residents in this case, Mexico has no interest in applying its limitation of damages—Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants." (*Id.* at p. 581.) Because Mexico had no interest in applying its limitation on wrongful death damages, *Hurtado*, like *Reich*, did not present a true conflict, and the court consequently concluded that California law should apply. (*Id.* at pp. 581–582.)

■ Although that case was readily resolved because it presented a false conflict, the court in *Hurtado*, *supra*, 11 Cal.3d 574, went on to elaborate on a number of distinct issues that must be carefully considered in resolving choice-of-law questions in wrongful death actions, issues that had not always been carefully separated and analyzed by the lower courts in other cases decided in the wake of *Reich*. After a fairly extended discussion (11 Cal.3d at pp. 582–584), the court in *Hurtado* summarized its conclusions by emphasizing that "[i]t is important . . . to recognize the three distinct aspects of a cause of action for wrongful death: (1) compensation for survivors, (2) deterrence of conduct and (3) limitation, or lack thereof, upon the damages recoverable. *Reich* v. *Purcell* recognizes that all three aspects are primarily local in character. The first aspect, insofar as *plaintiffs* are concerned, reflects the state's interest in providing for compensation and in determining the distribution of the proceeds, said interest extending only to local decedents and local beneficiaries . . . ; the second, insofar as *defendants* are concerned, reflects the state's interest in deterring conduct, said interest extending to all persons present within its borders; the third, insofar as *defendants* are concerned, reflects the state's interest in protecting resident defendants from excessive financial burdens. In making a choice of law, these three aspects of wrongful death must be carefully separated. The key step in this process is delineating the issue to be decided." (*Hurtado*, *supra*, 11 Cal.3d at p. 584.) This discussion in *Hurtado* teaches the importance, in applying the governmental interest analysis, of carefully examining what might at first blush appear to be a single subject or rule of law in order to identify the distinct state interests that may underlie separate aspects of the issue in question.

## C

Unlike *Reich, supra,* 67 Cal.2d 551, and *Hurtado, supra,* 11 Cal.3d 574—cases that were found, upon analysis, to present a false conflict—the case of *Bernhard v. Harrah's Club, supra,* 16 Cal.3d 313 (hereafter *Bernhard*) for the first time presented this court with the task of resolving a true conflict pursuant to the governmental interest analysis. In *Bernhard,* the plaintiff, a California resident, was injured while in California by a drunk driver who allegedly had been served drinks, while intoxicated, at a tavern owned by the defendant (Harrah's Club) that was located in Nevada. The plaintiff sued the defendant in California, contending that the defendant should be held liable because the plaintiff's injury was proximately caused by the defendant's negligence in serving alcohol to an intoxicated patron. When *Bernhard* was decided, California law authorized a person who was injured by an intoxicated driver to recover damages from a negligent tavern owner under such circumstances (see *Vesely v. Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151]), but under Nevada law—although it was a crime to sell alcohol to an intoxicated person—the courts specifically had ruled that a tavern owner could *not* be held civilly liable in tort for the injured person's damages. (*Hamm v. Carson City Nugget, Inc.* (1969) 85 Nev. 99 [450 P.2d 358].) The question in *Bernhard* was whether California or Nevada law should be applied in determining whether the defendant tavern owner should be held liable.

In analyzing the issue, the court in *Bernhard* first found that the case presented a true conflict. Nevada had an interest in having its decisional rule applied in order to protect its resident tavern owners—like the defendant in that case—from being subjected to a form of civil liability that Nevada had declined to impose. At the same time, California also had an interest in applying its contrary rule imposing liability in such circumstances, inasmuch as the rule was intended to protect members of the general public from injuries to persons and property resulting from the excessive use of intoxicating liquor. California had a special interest in applying its law to a California resident—like the plaintiff in that case—who was injured by a drunk driver within California. Under these circumstances, the court in *Bernhard* recognized that it was required to determine "the appropriate rule of decision in a controversy where each of the states involved has a legitimate but conflicting interest in applying its own law in respect to the civil liability of tavern keepers." (*Bernhard, supra,* 16 Cal.3d at p. 319.)

The court in *Bernhard, supra,* 16 Cal.3d 313, went on to discuss the basic process and standard by which true conflicts should be analyzed and resolved under California's governmental interest doctrine. The court explained that "[o]nce [a] preliminary analysis has identified a true conflict of

*the* governmental interests involved as applied to the parties under the particular circumstances of the case, the 'comparative impairment' approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be more impaired if its law were not applied. Exponents of this process of analysis emphasize that it is very different from a weighing process. The court does not ' "weigh" the conflicting governmental interests in the sense of determining which conflicting law manifested the "better" or the "worthier" social policy on the specific issue. An attempted balancing of conflicting state policies in that sense . . . is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish. . . . [The process] can accurately be described as . . . accommodation of conflicting state policies, as a problem of allocating domains of law-making power in multi-state contexts—limitations on the reach of state policies—as distinguished from evaluating the wisdom of those policies. . . . [E]mphasis is placed on the appropriate scope of conflicting state policies rather than on the "quality" of those policies . . . .' " (16 Cal.3d at pp. 320–321.)

In applying the comparative impairment approach to the circumstances of that case, the court in *Bernhard* initially observed that "[a]t its broadest limits [California's] policy would afford protection to all persons injured in California by intoxicated persons who have been sold or furnished alcoholic beverages while intoxicated regardless of where such beverages were sold or furnished. Such a broad policy would naturally embrace situations where the intoxicated actor had been provided with liquor by out-of-state tavern keepers." (*Bernhard, supra,* 16 Cal.3d at p. 322.) The court in *Bernhard* then continued: "We need not, and accordingly do not here determine the outer limits to which California's policy should be extended, for it appears clear to us that it must encompass defendant, who as alleged in the complaint, '[advertises] for and otherwise [solicits] in California the business of California residents at defendant HARRAH's CLUB Nevada drinking and gambling establishments, knowing and expecting said California residents, in response to said advertising and solicitation, to use the public highways of the State of California in going and coming from defendant HARRAH's CLUB Nevada drinking and gambling establishments.' Defendant by the course of its chosen commercial practice has put itself at the heart of California's regulatory interest, namely to prevent tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California in the intoxicated state. It seems clear that California cannot reasonably effectuate its policy if it does not extend its regulation to include out-of-state tavern keepers such as defendant who regularly and purposely sell intoxicating

beverages to California residents in places and under conditions in which it is reasonably certain these residents will return to California and act therein while still in an intoxicated state. California's interest would be very significantly impaired if its policy were not applied to defendant." (16 Cal.3d at pp. 322–323.)

Although the court in *Bernhard* recognized that application of California law would result in "an increased economic exposure" for a tavern keeper such as the defendant (*Bernhard, supra,* 16 Cal.3d at p. 323), it noted that "for businesses which actively solicit extensive California patronage, [such increased exposure] is a foreseeable and coverable business expense." (*Ibid.*) Finally, the court in *Bernhard* declared that "Nevada's interest in protecting its tavern keepers from civil liability of a boundless and unrestricted nature will not be significantly impaired when as in the instant case liability is imposed only on those tavern keepers who actively solicit California business." (*Ibid.*) Accordingly, having found that "California has an important and abiding interest in applying its rule of decision to the case at bench [and] that the policy of this state would be more significantly impaired if such rule were not applied" (*ibid.*), the court in *Bernhard* concluded that California law should be applied.

## D

The final precedent that we shall discuss is *Offshore Rental, supra,* 22 Cal.3d 157, a case that, like *Bernhard*, involved a true conflict.

In *Offshore Rental*, the plaintiff, a California corporation, brought a negligence action against the defendant out-of-state corporation, seeking to recover damages that the plaintiff corporation allegedly sustained as a result of an injury that an officer of the corporation suffered while the officer was on the defendant's premises in Louisiana. Prior to the commencement of the action, the defendant corporation already had compensated the injured officer for the damages that he had personally sustained, but, in the proceeding at issue in *Offshore Rental*, the plaintiff corporation sought to recover for the additional damages to its business interests that allegedly were caused by the injury to its officer.

In analyzing the choice-of-law issue, the court in *Offshore Rental, supra,* 22 Cal.3d 157, initially reviewed the respective laws of the two potentially affected jurisdictions—Louisiana and California. The court first noted that a Louisiana court recently had interpreted the relevant Louisiana statute—which provided that "[t]he master may bring an action against any man for beating or maiming his servant" (La. Civ. Code Ann., art. 174)—as *not* supporting a cause of action by a corporate plaintiff for the loss of services of

its officer. (See *Bonfanti Industries, Inc. v. Teke, Inc.* (La.Ct.App. 1969) 224 So.2d 15.) The court in *Offshore Rental* then explained that, by contrast, the few expressions in California cases ("although chiefly dicta" (*Offshore Rental, supra,* 22 Cal.3d at p. 162)) supported the plaintiff's assertion that California Civil Code section 49—which provides in part that "[t]he rights of personal relations forbid: [¶] . . . [¶] (c) Any injury to a servant which affects his ability to serve his master"—authorizes an employer to maintain a cause of action against a third party for a loss sustained by the employer as a result of an injury to a key employee that was caused by the negligence of the third party. (See, e.g., *Darmour Prod. Corp. v. H. M. Baruch Corp.* (1933) 135 Cal.App. 351 [27 P.2d 664]; *Fifield Manor v. Finston* (1960) 54 Cal.2d 632, 636 [7 Cal.Rptr. 377, 354 P.2d 1073].)

After determining that the applicable law of the two affected states apparently conflicted, the court in *Offshore Rental* examined the governmental interests involved in each state's law to determine whether, under the facts at issue, each state had an interest in having its law applied. The court found that, in view of the policies underlying the law of each state, both Louisiana and California had an interest in having its law applied in the case before it. Because Louisiana's law was aimed at protecting "negligent resident tortfeasors acting within Louisiana's borders from the financial hardships caused by the assessment of excessive legal liability or exaggerated claims resulting from the loss of services of a key employee" (*Offshore Rental, supra,* 22 Cal.3d at p. 164), and because the defendant in the case was "a Louisiana 'resident' whose negligence on its own premises has caused the injury in question" (*ibid.*), Louisiana clearly had an interest in having its law applied. And because California's law reflected an interest "in protecting California employers from economic harm because of negligent injury to a key employee inflicted by a third party" (*ibid.*)—an interest that "extends beyond such an injury inflicted within California, since California's economy and tax revenues are affected regardless of the situs of physical injury" (*ibid.*)—and because the plaintiff in that case was a California corporation that allegedly suffered loss as the result of the negligent injury of its key employee, California also had an interest in having its law applied. As a consequence, the court in *Offshore Rental* determined that the case involved a true conflict.

In thereafter undertaking the comparative impairment analysis set forth in *Bernhard, supra,* 16 Cal.3d 313, 320, and quoted above, the court in *Offshore Rental, supra,* 22 Cal.3d 157, explained that although the Louisiana rule of law had been set forth in a quite recent Louisiana decision that was directly in point, California, by contrast, "has . . . exhibited little concern in applying section 49 to the employer-employee relationship: despite the provisions of the antique statute, no California court has heretofore squarely held that California law provides an action for harm to business employees, and no California court has recently considered the issue at all. If . . . section 49 does

provide an action for harm to key corporate employees, . . . the section constitutes a law 'archaic and isolated in the context of the laws of the federal union.' " (*Offshore Rental, supra,* 22 Cal.3d at p. 168.) Under these circumstances, the court stated that "[w]e do not believe that California's interests in the application of its law to the present case are so compelling as to prevent an accommodation to the stronger, more current interest of Louisiana. We conclude therefore that Louisiana's interests would be the more impaired if its law were not applied, and consequently that Louisiana law governs the present case." (*Id.* at p. 169.)

## IV

Keeping in mind the choice-of-law principles and methodology set forth in these prior cases, we turn to the choice-of-law issue presented by the facts of this case. Here, the two potentially affected jurisdictions are California and Georgia, and the initial question is whether a conflict exists between the applicable law of each jurisdiction. In resolving that initial question, we must determine not only whether California law and Georgia law differ from one another, but also whether each state's law was intended to apply to a telephone conversation that occurs in part in California and in part in Georgia.

## A

We begin with the California statutory scheme.

■ In 1967, the California Legislature enacted a broad, protective invasion-of-privacy statute in response to what it viewed as a serious and increasing threat to the confidentiality of private communications resulting from then recent advances in science and technology that had led to the development of new devices and techniques for eavesdropping upon and recording such private communications. (Stats. 1967, ch. 1509, § 1, pp. 3584–3588, enacting Pen. Code, §§ 630–637.2.)[4] One of the provisions of the 1967 legislation—section 637.2—explicitly created a new, statutory private right of action, authorizing any person who has been injured by any

---

[4] The initial section of the 1967 legislation, codified as Penal Code section 630, reads in relevant part: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

"The Legislature by this chapter intends to protect the right of privacy of the people of this state."

Unless specified, all further statutory references are to the Penal Code.

violation of the invasion-of-privacy legislation to bring a civil action to recover damages and to obtain injunctive relief in response to such violation.[5] Although other provisions of the statutory scheme authorize prosecutors to seek penal sanctions for violations of the statute, the imposition of criminal punishment on the basis of conduct that occurs in part outside of California presents potential constitutional and statutory questions different from those involved in the maintenance of a civil cause of action for damages or injunctive relief. (See, for example, *Heath v. Alabama* (1985) 474 U.S. 82, 87–93 [88 L.Ed.2d 387, 106 S.Ct. 433]; *People v. Betts* (2005) 34 Cal.4th 1039, 1047 [23 Cal.Rptr.3d 138, 103 P.3d 883]; *People v. Morante* (1999) 20 Cal.4th 403, 427–430 [84 Cal.Rptr.2d 665, 975 P.2d 1071].) In the present case we have no occasion to consider the circumstances, if any, under which penal sanctions could or should appropriately be applied in such a factual context. The author of the 1967 legislation described the statutory provision establishing a private right of action as "perhaps the most effective enforcement mechanism available" for the privacy rights afforded by the enactment (Statement by Assem. Speaker Unruh before Sen. Com. on Judiciary re Assem. Bill No. 860 (1967 Reg. Sess.) June 8, 1967, p. 4) [describing bill that became 1967 statute]), and our concern here is solely whether plaintiffs may maintain a civil cause of action for damages and/or injunctive relief under section 637.2 under the factual circumstances alleged in the complaint.[6]

---

[5] Section 637.2 currently provides in full:

"(a) Any person who has been injured by a violation of this chapter may bring an action against the person who committed the violation for the greater of the following amounts:

"(1) Five thousand dollars ($5,000).

"(2) Three times the amount of actual damages, if any, sustained by the plaintiff.

"(b) Any person may, in accordance with Chapter 3 (commencing with Section 525) of Title 7 of Part 2 of the Code of Civil Procedure, bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a).

"(c) It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

[6] Although the invasion-of-privacy statutory scheme appears in the Penal Code and the Legislature chose to impose penal as well as civil sanctions for conduct that is prohibited by the legislation, in determining the scope of the civil cause of action embodied in section 637.2, we properly must consider the *substance*, rather than the *form*, of the statutory scheme. The reach of section 637.2 would be the same if the Legislature had adopted three separate statutes—one declaring that the prohibited conduct was unlawful, a second specifying the civil sanctions that could be imposed upon such unlawful conduct, and a third specifying the penal sanctions that could be imposed for such conduct—and had placed the first two statutes in the Civil Code and the third in the Penal Code. As noted above, the issue presented here is whether plaintiffs may maintain a civil cause of action for damages and/or injunctive relief under section 637.2 on the basis of the facts alleged in the complaint, and in resolving that issue there is no need to determine whether penal sanctions properly could or should be imposed under these circumstances. In accordance with traditional notions of judicial restraint, we believe it is appropriate and prudent to wait until we are faced with an instance in which a prosecutor has chosen to charge a criminal offense on the basis of such conduct before addressing the legal issues that might be raised in such a prosecution.

The recording of telephone conversations is governed by the provisions of section 632, one of the original provisions of the 1967 legislation. Under subdivision (a) of section 632, "[e]very person who, intentionally and without the consent of *all* parties to a confidential communication, by means of any electronic amplifying or recording device, . . . records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device" (italics added), violates the statute and is punishable as specified in the provision. Section 632, subdivision (b) provides in relevant part that "[t]he term 'person' includes an individual, business association, . . . corporation, . . . or other legal entity, . . . *but excludes an individual known by all parties to a confidential communication to be . . . recording the communication.*" (Italics added.) Section 632, subdivision (c), in turn, provides that "[t]he term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto,[7] *but excludes a communication made* in a public gathering . . . or *in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.*" (Italics added.)[8]

■ As made clear by the terms of section 632 as a whole, this provision does not absolutely preclude a party to a telephone conversation from

---

[7] In *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 772–777 [117 Cal.Rptr.2d 574, 41 P.3d 575], our court addressed the question of when a communication is "confidential" within the meaning of this provision, holding that "a conversation is confidential under section 632 if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded" (*id.* at pp. 776–777). We explained that the statutory scheme "protects against intentional, nonconsensual recording of telephone conversations regardless of the content of the conversation or the type of telephone involved." (*Id.* at p. 776.)

[8] Section 632 provides in full: "(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. If the person has previously been convicted of a violation of this section or Section 631, 632.5, 632.6, 632.7, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.

"(b) The term 'person' includes an individual, business association, partnership, corporation, limited liability company, or other legal entity, and an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but excludes an individual known by all parties to a confidential communication to be overhearing or recording the communication.

"(c) The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in

recording the conversation, but rather simply prohibits such a party from secretly or surreptitiously recording the conversation, that is, from recording the conversation without first informing all parties to the conversation that the conversation is being recorded.[9] If, after being so advised, another party does not wish to participate in the conversation, he or she simply may decline to continue the communication. A business that adequately advises all parties to a telephone call, at the outset of the conversation, of its intent to record the call would not violate the provision.[10]

---

any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

"(d) Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding.

"(e) This section does not apply (1) to any public utility engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited by this section are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility, or (2) to the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility, or (3) to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

"(f) This section does not apply to the use of hearing aids and similar devices, by persons afflicted with impaired hearing, for the purpose of overcoming the impairment to permit the hearing of sounds ordinarily audible to the human ear."

[9] Other provisions of the statutory scheme identify a number of limited circumstances in which secret recording by one party to a communication is permissible, such as when the recording is made "for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of extortion, kidnapping, bribery, any felony involving violence against the person, or a violation of Section 653m [making obscene phone calls with the intent to annoy]" (§ 633.5), or when a victim of domestic violence, acting pursuant to court authorization, records "any prohibited communication made to him or her by the perpetrator" of domestic violence (§ 633.6, subd. (a)). The calls at issue in this case do not fall within any of the statutorily authorized circumstances.

[10] In one passage in its opinion, the Court of Appeal suggested that even in the absence of an explicit advisement, clients or customers of financial brokers such as SSB "know or have reason to know" that their telephone calls with the brokers are being recorded. The Court of Appeal, however, did not cite anything in the record or any authority establishing such a proposition as a matter of law, and in light of the circumstance that California consumers are accustomed to being informed at the outset of a telephone call whenever a business entity intends to record the call, it appears equally plausible that, in the absence of such an advisement, a California consumer reasonably would anticipate that such a telephone call is not being recorded, particularly in view of the strong privacy interest most persons have with regard to the personal financial information frequently disclosed in such calls.

The complaint in this case explicitly alleges that plaintiffs had a reasonable expectation of privacy in the telephone calls in question, and because this case is before us after the sustaining of a demurrer, we cannot assume for purposes of this appeal that the telephone conversations here at issue were not "confidential communications" within the meaning of section 632.

The language of section 632 does not explicitly address the issue whether the statute was intended to apply when one party to a telephone call is in California and another party is outside California. The legislatively prescribed purpose of the 1967 invasion-of-privacy statute, however, is "to protect the right of privacy of the people of this state" (§ 630), and that purpose certainly supports application of the statute in a setting in which a person outside California records, without the Californian's knowledge or consent, a telephone conversation of a California resident who is within California. Furthermore, the companion wiretapping provision of the 1967 act—set forth in section 631, subdivision (a)—specifically applies to any person who attempts to learn the content of any communication "while the same *is in transit . . . or is being sent from, or received at any place within this state.*" (Italics added).[11] Nothing in the language or purpose of the 1967 legislation suggests that the related provisions of section 632 should not similarly apply to protect against the secret recording of any confidential communication that is sent from or received at any place within California.

SSB contends that section 632 should not be interpreted to apply in such a situation, because application of the statute in this setting would constitute a disfavored "extraterritorial" application of the statute. (See, e.g., *North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1, 4 [162 P. 93].) Interpreting that statute to apply to a person who, while outside California, secretly records what a California resident is saying in a confidential communication *while he or she is within California,* however, cannot accurately be characterized as an unauthorized *extraterritorial* application of the statute, but more reasonably is viewed as an instance of applying the statute to a multistate event in which a crucial element—the confidential communication by the California resident— occurred *in California.* The privacy interest protected by the statute is no less directly and immediately invaded when a communication *within California* is secretly and contemporaneously recorded from outside the state than when this action occurs within the state. A person who secretly and intentionally records such a conversation from outside the state effectively acts within California in the same way a person effectively acts within the state by, for example, intentionally shooting a person in California from across the California-Nevada border. (See, for example, *State v. Hall* (1894) 114 N.C. 909 [19 S.E. 602, 602–606]; see generally Leflar, American Conflicts Law (4th ed. 1986) § 111, pp. 309–311.) Because there can be no question but that the principal purpose of section 632 is to protect the privacy

---

[11] Section 631, subdivision (a) provides in relevant part: "Any person who, by means of any machine, instrument, or contrivance . . . intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, . . . or who . . . without the consent of all parties to the communication . . . attempts to . . . learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" commits a violation of the provision.

of confidential communications of California residents *while they are in California*, we believe it is clear that section 632 was intended, and reasonably must be interpreted, to apply in this setting. Unlike the conduct at issue in the cases cited by SSB (see, for example, *North Alaska Salmon Co. v. Pillsbury, supra*, 174 Cal. 1, 4; *Norwest Mortgage, Inc. v. Superior Court* (1999) 72 Cal.App.4th 214, 222–223 [85 Cal.Rptr.2d 18]), here SSB's employees allegedly acted to record conversations that were occurring contemporaneously in California. Although, as explained below in connection with the discussion of the relevant Georgia privacy statute, the privacy statute of another state also may apply to an interstate telephone call between California and the other state, we conclude that section 632 clearly is applicable in the present setting.[12]

■ Accordingly, construing section 632 in light of the language and purpose of the relevant statutory scheme as a whole, we conclude that section 632 applies when a confidential communication takes place in part in California and in part in another state.[13]

---

[12] SSB concedes that this matter would not involve an improper extraterritorial application of a California statute if SSB's alleged wrongful conduct related to the *content* of a communication sent into California—for example, an obscene or harassing phone call (see, e.g., *Schlussel v. Schlussel* (1983) 141 Cal.App.3d 194, 197–198 [190 Cal.Rptr. 95] [holding that Pen. Code, § 653m, prohibiting the making of an obscene phone call with the intent to annoy, applies to a phone call made from Florida to California])—but it maintains that this case is distinguishable because here the alleged wrongful conduct does not relate to the content of SSB's communications. Unlike the statute at issue in the *Schlussel* case to which SSB refers, however, the focus and purpose of the California statute here at issue is the protection of privacy, and the alleged conduct of SSB in question constitutes an invasion of privacy *within* California. Accordingly, for the same reason that the court in *Schlussel* concluded that the statute there at issue applied to an instance in which a phone call originating outside California inflicted, within California, the type of injury against which the relevant statute was intended to provide protection, we conclude that section 632 properly must be interpreted to apply to the invasion of privacy alleged to have occurred within California in the present case.

[13] In arguing that section 632 should not be interpreted to apply when a telephone call to or from California is recorded in another state, SSB relies upon a letter written by Assembly Speaker Jesse Unruh, the principal author of the 1967 invasion-of-privacy statute, in which he refers to an amendment to the 1967 act that he was considering introducing in the Legislature. Although the letter—which was not before, or considered by, the Legislature—does not appear to be a proper subject of judicial notice (see, for example, *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699–701 [170 Cal.Rptr. 817, 621 P.2d 856]), in any event we do not believe that the letter supports SSB's contention.

In the letter in question, the amendment that Speaker Unruh ostensibly proposed to introduce is set forth as follows: "No evidence obtained as a result of eavesdropping upon or recording a confidential communication in any other state, government, country or jurisdiction which if obtained in this state would have been obtained in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding." The letter explains that "[t]he purpose of the above amendment is to cover under the statute's provision

# B

We turn next to the applicable Georgia law.

Georgia, like California, has enacted a broad statute addressing eavesdropping upon or recording of private conversations. The basic provision of the Georgia privacy statute provides in relevant part that "[i]t shall be unlawful for: (1) Any person in a clandestine manner intentionally to overhear, transmit, or record or attempt to overhear, transmit, or record the private conversation of another which shall originate in any private place . . . ." (Ga. Code Ann. § 16-11-62.) The Georgia Supreme Court, in a decision concluding that the statute applied to one spouse's secret recording of telephone conversations of the other spouse, quoted a provision setting forth the general legislative intent underlying the statute: " 'It is the public policy of this State and the purpose and intent of this Chapter to protect the citizens of this State from invasions upon their privacy. This Chapter shall be construed in light of this expressed policy and purpose. The employment of devices which would permit the clandestine overhearing, recording or transmitting of conversations or observing of activities which occur in a private place has come to be a threat to an individual's right of privacy and, therefore, should be prohibited.' " (*Ransom v. Ransom* (1985) 253 Ga. 656 [324 S.E.2d 437, 438–439]; see also *Bishop v. State, supra,* 526 S.E.2d 917 [interpreting Georgia statute to prohibit parents from recording their teenage child's telephone conversations without the teenager's consent].)

At the same time, however, another provision of the relevant Georgia statutory scheme explicitly provides that "[n]othing in Code Section 16-11-62 [that is, the foregoing statutory provision] shall prohibit a person from intercepting a wire, oral, or electronic communication *where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.*" (Italics added.) (Ga. Code Ann. § 16-11-66.) Georgia decisions long have interpreted the relevant Georgia privacy statutes as *not* applicable to a situation in which a conversation is

out-of-state testimony obtained by means illegal in California, and to rule out such testimony just as it would be inadmissible if obtained in California." (Jesse M. Unruh, Speaker of the Assembly, letter to H. Lee Van Boven, Nov. 22, 1968.)

Although SSB apparently assumes that the amendment in question was intended to deal with the type of factual setting at issue in the present case, in our view it is more likely that the proposed amendment was intended to cover a situation in which the *entire* secretly recorded communication (telephone call or other) occurred outside of California, and in which a party in a lawsuit in California thereafter sought to introduce the recording of the communication into evidence in the California proceeding. There is nothing in the letter—or in any of the appropriately considered legislative history—indicating that Speaker Unruh (or, more importantly, the Legislature as a whole) believed the originally enacted version of section 632 would not apply to a telephone conversation in which an out-of-state participant secretly recorded what was said by a California party while within California.

recorded by one of the participants in the conversation. (See, for example, *Mitchell v. State* (1977) 239 Ga. 3 [235 S.E.2d 509, 510–511].) In this respect, of course, Georgia law differs from California law.[14]

■ With regard to the further question whether the Georgia privacy statutes are intended to apply to a telephone call in which one of the parties is in Georgia and one of the parties is in another state, there is nothing in the language of the Georgia statutes that expressly addresses this issue. In light of the underlying purpose of the Georgia statute, however, we believe that—as we have concluded with regard to the California statute—the applicable Georgia statutes were intended, and reasonably should be interpreted, to apply to such a call.

A hypothetical example may help explain our conclusion in this regard. Consider a situation in which a third party—located in a state other than Georgia or California—were to wiretap or intercept a telephone call between a person in Georgia and a person in California without the knowledge or consent of either party to the conversation. In that setting, the wiretapping would violate the relevant privacy law of both California and Georgia, and each state clearly would have a legitimate and substantial interest in applying its statute to the unlawful invasion of privacy of the person located within its state, whereas the state in which the person who committed the wiretapping was situated would not have *that* interest (although it still might have an interest in permitting an action against the wiretapper if the conduct were unlawful under its state's law). As this example demonstrates, in light of the principal purpose underlying the kind of privacy provisions here at issue, it is most reasonable to conclude that a state's privacy statute should be interpreted to apply to a telephone call in which one or more of the parties to the call are located within the state.

Accordingly, we conclude that the Georgia statute, as well as the California statute, applies to the telephone calls at issue in this case, and that the law of each state differs with regard to the legality of such conduct. Although it is unlawful under California law for a party to a telephone conversation to record the conversation without the knowledge of all other parties to the conversation, such conduct is not unlawful under Georgia law.

---

[14] The dichotomy between the California and Georgia privacy statutes in this regard is representative of a division in analogous privacy statutes throughout the nation. Privacy statutes in a majority of states (as well as the comparable federal provision)—like the Georgia statute—prohibit the recording of private conversations except with the consent of one party to the conversation, but a sizeable minority of states (11 states, according to an apparently well-researched law review article)—including California—prohibit such recording without the consent of all parties to the conversation. (See Bast, *What's Bugging You? Inconsistencies and Irrationalities of the Law of Eavesdropping* (1998) 47 DePaul L.Rev. 837, 870.)

## C

Plaintiffs maintain, however, that although California law and Georgia law differ, there nonetheless is no true conflict in this situation. Although it is evident that California has a legitimate interest in having its law applied in the present setting because plaintiffs are California residents whose telephone conversations in California were recorded without their knowledge or consent, plaintiffs contend that Georgia does not have an interest in having its law applied here, because the fundamental purpose of the Georgia statute is to protect the privacy of conversations that have some relationship to Georgia and in this case there is no claim that the privacy of any Georgia resident or any person or business in Georgia has been violated.

Although plaintiffs are correct that the facts of this case do not implicate the privacy interests protected by the Georgia statute, the Georgia statute also can reasonably be viewed as establishing the general ground rules under which persons in Georgia may act with regard to the recording of private conversations, including telephone calls. Because Georgia law prohibits the recording of such conversations except when the recording is made by one of the parties to the conversation or with such a party's consent, persons in Georgia reasonably may expect, at least as a general matter, that they lawfully can record their own conversations with others without obtaining the other person's consent, and Georgia has a legitimate interest in not having liability imposed on persons or businesses who have acted in Georgia in reasonable reliance on the provisions of Georgia law. Because the conduct of SSB that is at issue in this case involves activity that its employees engaged in within Georgia, we believe that Georgia possesses a legitimate interest in having its law applied in this setting.

Accordingly, we conclude that this case presents a true conflict of laws.

## V

As discussed at some length earlier (*ante*, at pp. 111–115), the governing authorities establish that once a court's preliminary analysis has identified a true conflict, "the 'comparative impairment' approach . . . seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." (*Bernhard, supra*, 16 Cal.3d 313, 320.) As our prior decisions have emphasized, in conducting this evaluation "[t]he court does not ' "weigh" the conflicting governmental interests in the sense of determining which conflicting law manifest[s] the "better" or the "worthier" social policy on the specific issue' " (*ibid.*), because " '[a]n attempted balancing of conflicting state policies in that sense . . . [would be] difficult to justify in the context of a federal system in which, within constitutional limits, states

are empowered to mold their policies as they wish.' " (*Ibid.*) Instead, the comparative impairment process can more " 'accurately be described as . . . [an] accommodation of conflicting state policies' " (*ibid.*), attempting, to the extent practicable, to achieve "the 'maximum attainment of underlying purpose by all governmental entities.' " (*Offshore Rental, supra,* 22 Cal.3d 157, 166.) Under the comparative impairment approach, true conflicts are resolved "by applying the law of the state whose interest would be the more impaired if its law were not applied." (*Bernhard, supra,* 16 Cal.3d at p. 320.)

We proceed to evaluate the relative impairment of each state's interests that would result were the law of the other state to be applied in this setting, beginning with California's.

## A

In considering the degree of impairment of California's interest that would result if Georgia law rather than California law were applied, we note initially that the objective of protecting individuals in California from the secret recording of confidential communications by or at the behest of another party to the communication was one of the principal purposes underlying the 1967 invasion-of-privacy enactment. When the proposed legislation—then designated Assembly Bill No. 860—was before the California Legislature, Assembly Speaker Unruh, the principal author of the legislation, prepared a statement that he delivered before the Senate Committee on the Judiciary in conjunction with its consideration of the bill, in which he explained the impetus for the legislation and described "four major changes" in the law proposed in the bill. (Statement by Assem. Speaker Unruh before Sen. Com. on Judiciary re Assem. Bill No. 860 (1967 Reg. Sess.) June 8, 1967, p. 2.) The first of the major changes described in Speaker Unruh's statement concerned the issue in question here: "In the first place, whereas such invasions of privacy are presently legal if only one party consents to the listening in, Assembly Bill 860 would require that all parties must consent. This is a most reasonable requirement. [¶] Presently it is entirely legal for one who receives a call to be totally unaware that it is being listened to by another party. Likewise, a party may converse in person with another party who is secretly recording the conversation—he may be seriously injured by that conversation, either personally or in his business affairs—and he has no recourse at law. [¶] Assembly Bill 860 would correct this defect. It is a defect that was less meaningful before the recent development and widespread availability of eavesdropping devices, but as the advertising material which I have passed out to you indicates, it is a legal defect which is most apparent today." (*Id.*, pp. 2–3, underscoring in original.)

In addition, it is clear that this is most certainly *not* an instance like *Offshore Rental, supra,* 22 Cal.3d 157, in which the court found that the California

statute in question was "ancient" and rarely if ever utilized or relied upon and concluded that the state had little *current* interest in the application of its own law. (*Id.* at pp. 167–168.) On the contrary, California decisions repeatedly have invoked and vigorously enforced the provisions of section 632 (see, e.g., *Flanagan v. Flanagan, supra,* 27 Cal.4th 766, 776 ["the Privacy Act . . . protects against intentional, nonconsensual recording of telephone conversations regardless of the content of the conversation or the type of telephone involved"]; *Ribas v. Clark* (1985) 38 Cal.3d 355, 361 [212 Cal.Rptr. 143, 696 P.2d 637] ["secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements"]; *Warden v. Kahn, supra,* 99 Cal.App.3d 805, 812–814) and have looked to the policy embodied in the provision in analyzing invasion-of-privacy claims in related contexts. (See, e.g., *Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 914–923 [85 Cal.Rptr.2d 909, 978 P.2d 67]; *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 234–235 [74 Cal.Rptr.2d 843, 955 P.2d 469].)

Furthermore, in recent years the California Legislature has continued to add provisions to and make modifications of the invasion-of-privacy statutory scheme here at issue (see, for example, Pen. Code, §§ 632.5–632.7 [cordless or cellular phones], 633.6 [permitting recording by victims of domestic violence upon court order]) and in addition repeatedly has enacted new legislation in related areas in an effort to increase the protection of California consumers' privacy in the face of a perceived escalation in the impingement upon privacy interests caused by various business practices. (See, e.g., Civ. Code, §§ 1798.80–1798.84 [disclosure of consumer records], 1798.85–1795.86 [Social Security numbers], 1798.90.1 [driver's license information], 1798.91 [medical information], 1799–1799.2 [business records], 1799.3 [disclosure of personal information by providers of videocassette sales or rental services].) In addition, California's explicit constitutional privacy provision (Cal. Const., art. I, § 1) was enacted in part specifically to protect Californians from overly intrusive business practices that were seen to pose a significant and increasing threat to personal privacy. (See, e.g., *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15–20 [26 Cal.Rptr.2d 834, 865 P.2d 633]; *White v. Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222]; cf. *Rattray v. City of National City* (9th Cir. 1994) 51 F.3d 793, 797 ["Having one's personal conversations secretly recorded may well infringe upon the right to privacy guaranteed by the California Constitution"].)

Thus, we believe that California must be viewed as having a strong and continuing interest in the full and vigorous application of the provisions of section 632 prohibiting the recording of telephone conversations without the knowledge or consent of *all* parties to the conversation.

■ We also believe that the failure to apply section 632 in the present context would substantially undermine the protection afforded by the statute. Many companies who do business in California are national or international firms that have headquarters, administrative offices, or—in view of the recent trend toward outsourcing—at least telephone operators located outside of California. If businesses could maintain a regular practice of secretly recording all telephone conversations with their California clients or customers in which the business employee is located outside of California, that practice would represent a significant inroad into the privacy interest that the statute was intended to protect. As noted above (*ante*, at pp. 104–105), an out-of-state company that does business in another state is required, at least as a general matter, to comply with the laws of a state and locality in which it has chosen to do business. (See, e.g., *Watson v. Employers Liability Assurance Corp.*, *supra*, 348 U.S. 66, 72.) As this court determined in *Bernhard*, *supra*, 16 Cal.3d 313, 322–323, with regard to the need to apply California law relating to the liability of tavern owners to the out-of-state tavern owner at issue in that case, the failure to apply California law in the present context seriously would undermine the objective and purpose of the statute.

Moreover, if section 632—and, by analogy, other similar consumer-oriented privacy statutes that have been enacted in California—could not be applied effectively to out-of-state companies but only to California companies, the unequal application of the law very well might place local companies at a competitive disadvantage with their out-of-state counterparts. To the extent out-of-state companies may utilize such undisclosed recording to further their economic interests—perhaps in selectively disclosing recordings when disclosure serves the company's interest, but not volunteering the recordings' existence (or quickly destroying them) when they would be detrimental to the company—California companies that are required to comply with California law would be disadvantaged. By contrast, application of section 632 to all companies in their dealings with California residents would treat each company equally with regard to California's concern for the privacy of the state's consumers.

In sum, we conclude that the failure to apply California law in the present context would result in a significant impairment of California's interests.

B

By contrast, we believe that, for a number of reasons, the application of California law rather than Georgia law in the context presented by the facts of this case would have a relatively less severe effect on Georgia's interests.

First, because California law, with regard to the particular matter here at issue, is more protective of privacy interests than the comparable Georgia

privacy statute, the application of California law would not violate any privacy interest protected by Georgia law. In addition, there is, of course, nothing in Georgia law that *requires* any person or business to record a telephone call without providing notice to the other parties to the call, and thus persons could comply with California law without violating any provision of Georgia law.

Second, with respect to businesses in Georgia that record telephone calls, California law would apply only to those telephone calls that are made to or received from California, not to all telephone calls to and from such Georgia businesses. In considering the practicability of singling out California calls for distinct treatment, there would appear to be little question that it would be feasible for a business to identify those calls that its own employees *are making to* current or potential California clients. Similarly, with regard to calls *received by* a business in Georgia, it appears likely that technical tools—such as "caller ID"—are available that readily would make it possible to identify which calls received by the Georgia office are coming from California, and, even in the absence of such technological devices, there would appear to be no reason why an SSB employee, when answering a call, could not simply inquire where the client is calling from. Thus, application of California law would appear to affect only those telephone calls to or from California.

Furthermore, applying California law to a Georgia business's recording of telephone calls between its employees and California customers will not severely impair Georgia's interests. As discussed above (*ante*, at pp. 117–118), California law does not totally prohibit a party to a telephone call from recording the call, but rather prohibits only the *secret* or *undisclosed* recording of telephone conversations, that is, the recording of such calls without the knowledge of all parties to the call. Thus, if a Georgia business discloses at the outset of a call made to or received from a California customer that the call is being recorded, the parties to the call will not have a reasonable expectation that the call is not being recorded and the recording would not violate section 632. Accordingly, to the extent Georgia law is intended to protect the right of a business to record conversations when it has a legitimate business justification for doing so, the application of California law to telephone calls between a Georgia business and its California clients or customers would not defeat that interest. The Court of Appeal, in reaching the conclusion that Georgia law should apply, thought it important to emphasize that Georgia has a legitimate interest in permitting a financial services entity, such as SSB, to routinely record telephone calls "for the perfectly understandable purpose of protecting themselves from the customer who might later claim the institution misunderstood his or her investment instructions," but the appellate court failed to recognize that the application of California law would not thwart that interest. Although the

application of California law to telephone calls between Georgia and California would impair Georgia's interests to the extent Georgia law is intended to protect a business's ability *secretly* to record its customers' telephone calls, we believe that, particularly as applied to a business's blanket policy of routinely recording telephone calls to and from California customers, this consequence would represent only a relatively minor impairment of Georgia's interests.

For the foregoing reasons, we conclude that, as a realistic matter, the application of California law in this context would not result in a severe impairment of Georgia's interests.

## C

Accordingly, because we have found that the interests of California would be severely impaired if its law were not applied in this context, whereas Georgia's interest would not be significantly impaired if California law rather than Georgia law were applied, we conclude that, with the one exception we discuss below, California law should apply in determining whether the alleged secret recording of telephone conversations at issue in this case constitutes an unlawful invasion of privacy.

## VI

Although, for the reasons just discussed, we have concluded that, as a general matter, the comparative impairment analysis supports the application of California law in this context, we believe it is appropriate to make an exception with regard to one distinct issue—the question of SSB's potential monetary liability for its *past* conduct.

As we have noted above, prior California decisions establish that one of the objectives of the comparative impairment analysis "is the 'maximum attainment of underlying purpose by *all* governmental entities . . . .' " (*Offshore Rental, supra*, 22 Cal.3d 157, 166, italics added.) In seeking to maximize each affected state's interest to the extent feasible in the present context, we believe it is appropriate, for the reasons discussed below, to restrain the application of California law with regard to the imposition of liability for acts that have occurred in the past, in order to accommodate Georgia's interest in protecting persons who acted in Georgia in reasonable reliance on Georgia law from being subjected to liability on the basis of such action.

To begin with, we recognize that Georgia has a legitimate interest in ensuring that individuals and businesses who act in Georgia with the reasonable expectation that Georgia law applies to their conduct are not thereafter

unexpectedly and unforeseeably subjected to liability for such actions. The Court of Appeal in the present case relied heavily upon this interest in reaching its conclusion, and we believe that court's assessment of the substantiality of this state interest is reasonable. (Accord, *People v. One 1953 Ford Victoria* (1957) 48 Cal.2d 595, 599 [311 P.2d 480] [recognizing propriety of accommodating reasonable expectations of persons who act in another state in reasonable reliance on the other state's law].)

To be sure, one legitimately might maintain that SSB reasonably should have anticipated that its recording of a telephone conversation with a California client when the client is in California would be governed by California law, regardless of where the SSB employee with whom the client is speaking happens to be located. (See NASD Notice to Members 98-52 (eff. Aug. 17, 1998), p. 394.)[15] Although SSB would have reached that conclusion had it undertaken the extended choice-of-law analysis set forth above, we recognize that at the time of SSB's past actions the few lower court decisions that had considered a legal challenge to the recording of an interstate telephone conversation had reached differing conclusions as to which state's law should apply—the law of the state where the person who recorded the conversation was situated, or instead the law of the state where the person whose words were being recorded was located.[16] Although none of the prior cases involved the type of repeated recording of customer telephone calls by

---

[15] This NASD document, issued in 1998 with regard to the application of NASD rule 3010 (see, *ante*, at p. 106, fn. 3), states in relevant part: "In complying with the Taping Rule, members must comply with federal and state civil and criminal statutes governing the tape recording of conversations. Each state has a statute governing wiretapping; there also is a federal statute governing wiretapping and electronic surveillance. The federal statute and the majority of the state statutes permit taping telephone conversations with the consent of one party (one-party statutes); a minority of state statutes require the consent of all parties to the conversation (two-party statutes). Three issues arise from the proposed Rule: what is necessary to comply with one-party statutes; what is necessary to comply with two-party statutes; and how to comply where a conversation occurs between a person in a one-party state and a person in a two-party state.

"*The question of which state law applies when a conversation occurs between a person in a one-party statute state and a person in a two-party statute state is an open issue that depends on the individual laws of each state and the individual facts. Firms would be required to independently determine that state laws are satisfied. The best practice in each case would be for member firms to notify their registered persons and customers that their telephone calls are being tape recorded.*" (NASD Notice to Members 98-52, p. 394, italics added, fns. omitted.)

[16] The prior cases involved the application of the law of four jurisdictions: Florida, Massachusetts, New York, and Texas, although not all of the cases analyzed the issue under choice-of-law principles. In Florida, an intermediate state appellate court held that Florida law—which, like California law, prohibits the recording of a telephone call without the consent of all parties—applied and rendered unlawful the recording in Georgia of a telephone call between the defendant in Georgia and the plaintiff in Florida. (*Koch v. Kimball* (Fla.Dist.Ct.App.1998) 710 So.2d 5.) In Massachusetts, a number of federal district court decisions applying Massachusetts law ruled that the law of the state in which the person is doing the recording should apply, and therefore rejected actions brought by Massachusetts

a business entity that is involved here, we nonetheless believe that prior to our resolution of the issue in this case a business entity reasonably might have been uncertain as to which state's law was applicable and reasonably might have relied upon the law of the state in which its employee was located. Under these circumstances, we believe Georgia has a legitimate interest in not having SSB subjected to liability on the basis of its employees' past actions in Georgia.

At the same time, although California law expressly authorizes the recovery of damages for violations of section 632 (§ 637.2, subd. (a)), we believe that it is appropriate to recognize that ascribing a monetary value to the invasion of privacy resulting from the secret recording of a telephone conversation is difficult in any event, and that the deterrent value of such a potential monetary recovery cannot affect conduct that already has occurred. Under these circumstances, we conclude that denying the recovery of damages for conduct that was undertaken in the past in ostensible reliance on the law of another state—and prior to our clarification of which state's law applies in this context—will not seriously impair California's interests.

Accordingly, although we conclude that in general California law is applicable in this setting and that plaintiffs may seek injunctive relief to require SSB to comply with California law in the future, we shall apply Georgia law with respect to SSB's potential monetary liability for its past conduct, thus relieving SSB of any liability for damages for its past recording of conversations. (Cf., e.g., *Ex parte Archy* (1858) 9 Cal. 147, 171 [applying clarification of choice-of-law rule prospectively].)[17] In light of our decision, of course, out-of-state companies that do business in California now are on notice that, with regard to future conduct, they are subject to California law

---

residents (whose law—like California law—requires the consent of all parties) against the defendants who recorded the calls in states where the consent of only one party is required. (*MacNeill Engineering Co. v. Trisport, Ltd.* (D.Mass. 1999) 59 F.Supp.2d 199, 202; *Pendell v. AMS/Oil, Inc.* (D.Mass. 1986) 1986 U.S.Dist. Lexis 26089.) In New York, a federal district court applying New York law held that where the party whose conversation was secretly recorded was located in a state that permitted the recording of a conversation with the consent of one party, that party could not maintain an action even though the defendant who recorded the conversation was located in a state that required the consent of all parties to the conversation. (*Wehringer v. Brannigan* (S.D.N.Y. 1990) 1990 U.S.Dist. Lexis 16447; see also *Locke v. Aston* (2006) 814 N.Y.S.2d 38.) In Texas, a federal district court applying Texas's "most significant relationship" choice-of-law test concluded that Texas law (which required the consent of only one party to the conversation), rather than California law, should apply when a company employee in Texas recorded telephone conversations with other company employees in California. (*Becker v. Computer Sciences Corp.* (S.D.Tex. 1982) 541 F.Supp. 694, 703–705.)

[17] For the same reasons that lead us to conclude that monetary damages may not be obtained on the basis of SSB's past actions, we also conclude that it would be inappropriate to require SSB to provide reimbursement under the provisions of the unfair competition law on the basis of such past actions.

with regard to the recording of telephone conversations made to or received from California, and that the full range of civil sanctions afforded by California law may be imposed for future violations.[18]

## VII

Finally, we briefly address a point raised by one of the amicus curiae briefs that have been filed in this court, focusing specifically upon the potential application of California's unfair competition law (UCL) in this case. The brief of amicus curie Pacific Legal Foundation suggests that because, as compared to other states' consumer protection laws, the UCL "provides the broadest right of action to the widest number of people," the reach of the statute should be restrained in the application of California's choice-of-law principles.

In our view, we have no occasion in the present case to address the concerns advanced by amicus curiae, because this case does not present any of the potentially more controversial aspects of the UCL and the provisions of that law will not affect the potential relief that plaintiffs may obtain in this case. Here, we are not dealing with conduct that assertedly is simply "unfair" (see generally *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180–187 [83 Cal.Rptr.2d 548, 973 P.2d 527]), but rather with alleged conduct that is "unlawful" and already subject to an express statutory private right of action. (§ 637.2.) Further, both the named plaintiffs and the members of the proposed class allegedly are direct victims of the unlawful conduct, rather than simply unharmed persons suing on behalf of the general public. (Cf., e.g., *Consumers Union of United States, Inc. v. Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1437–1444 [257 Cal.Rptr. 151]; see also Prop. 64, Gen. Elec. (Nov. 2, 2004), amending Bus. & Prof. Code, § 17204.) In addition, an injunctive remedy is authorized not only by the terms of the UCL (Bus. & Prof. Code, § 17203), but by the terms of section 637.2 itself. Finally, as discussed earlier (*ante*, at p. 130, fn. 17), to the extent plaintiffs seek reimbursement under the UCL for SSB's past conduct, we have concluded that such reimbursement is unavailable.

---

[18] To avoid any misunderstanding regarding the scope of our ruling, we note that this case does not present the question whether secret recordings that were made prior to this decision would or would not be admissible in a judicial or other proceeding, and we express no opinion on that question. Furthermore, because this case does not involve the isolated recording of a personal telephone call by an out-of-state individual in a nonbusiness setting, or the recording of a phone call by an out-of-state business that has a reasonable, individualized basis for believing that a particular caller is engaged in criminal or wrongful conduct, we have no occasion to determine how the comparative impairment analysis would apply in those or other comparable settings.

## VIII

For the reasons discussed above, the judgment of the Court of Appeal is reversed insofar as it precludes plaintiffs from going forward with their action to obtain injunctive relief, and is affirmed insofar as it upholds the dismissal of the action with regard to the recovery of monetary damages and restitution. Plaintiffs shall recover their costs on appeal.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellants' petition for a rehearing was denied September 27, 2006.