**David CASSIRER**

v.

**THYSSEN-BORNEMISZA COLLECTION FOUNDATION**

**CV 05–3459–JFW (Ex)**

United States District Court, C.D. California.

Signed June 4, 2015

Bert H. Deixler, George Emel Pence, IV, Laura W. Brill, Nicole Phillis, William Ames Jacobson, Kendall Brill and Kelly LLP, Andrew Ross Hall, Davis Wright Tremaine, Los Angeles, CA, John A. Reed, Davis Wright Tremaine, Seattle, WA, for David Cassirer.

Sarah E. Andre, Thaddeus J. Stauber, Irene Tatevosyan, Jason P. Gonzalez, Jessica N. Walker, Kelly L. Kress, Nixon Peabody LLP, Los Angeles, CA, for Thyssen-Bornemisza Collection Foundation.

PROCEEDINGS (IN CHAMBERS): ORDER GRANTING THYSSEN–BORNEMISZA COLLECTION FOUNDATION'S MOTION FOR SUMMARY JUDGMENT [filed 3/23/2015; Docket No. 249];

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION RE: CHOICE OF CALIFORNIA LAW [filed 3/23/2015; Docket No. 251]

HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

On March 23, 2015, Defendant Thyssen–Bornemisza Collection Foundation (the "Foundation") filed a Motion for Summary Judgment [Docket No. 249]. On April 20, 2015, Plaintiffs David Cassirer, Ava Cassirer, and United Jewish Federation of San Diego County (collectively, "Plaintiffs") filed their Opposition [Docket No. 273]. On May 4, 2015, the Foundation filed a Reply [Docket No. 289].[1] On March 23, 2015, Plaintiffs filed a Motion for Summary Adjudication Re Choice of California Law [Docket No. 251]. On April 20, 2015, the Foundation filed an Opposition [Docket No. 271]. On May 4, 2014, Plaintiffs filed a Reply [Docket No. 288].

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7–15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's May 18, 2015 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply pa-

---

1. On May 11, 2015, Plaintiffs filed an *Ex Parte* Application for Leave to File Supplemental Declaration of Alfredo Guerrero and to Respond to Defendant's Evidentiary Objections to Plaintiffs' Expert Declarations ("*Ex Parte* Application") [Docket No. 298]. On May 12, 2015, the Foundation filed an Opposition [Docket No. 300]. On May 12, 2015, Plaintiffs filed a Reply [Docket No. 301]. For good cause shown and because there is no prejudice to the Foundation, the Court **GRANTS** Plaintiff's *Ex Parte* Application.

pers, and the arguments therein, the Court rules as follows:

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

In this action, Plaintiffs seek to recover the painting, *Rue St. Honoré, après midi, effet de pluie*, by French impressionist Camille Pissarro (the "Painting"), that was wrongfully taken from their ancestor, Lilly Cassirer Neubauer ("Lilly"),[3] by the Nazi regime.

Lilly inherited the Painting in 1926. As a Jew, she was subjected to increasing persecution in Germany after the Nazis seized power in 1933. In 1939, in order for Lilly and her husband Otto Neubauer to obtain exit visas to flee Germany, Lilly was forced to transfer the Painting to Jakob Scheidwimmer, a Nazi art appraiser. In "exchange," Scheidwimmer transferred 900 Reichsmarks (around $360 at 1939 exchange rates), well below the actual value of the painting, into a blocked account that Lilly could never access. After the war, Lilly filed a timely restitution claim. Because the location of the Painting was unknown, Lilly ultimately settled her claim for monetary compensation with the German government, but did not waive her right to seek restitution or return of the Painting. *See* Order dated March 13, 2015 [Docket No. 245].

Without Lilly's knowledge, the Painting surfaced in the United States in 1951. In July 1951, the Painting was sold to collector Sydney Brody in Los Angeles, California through art dealers M. Knoedler & Co. in New York and Frank Perls Gallery in Beverly Hills, California. The Frank Perls Gallery earned a commission of $3,105 for arranging the sale of the Painting to Sydney Brody. Less than a year later, in May 1952, Sydney Schoenberg, an art collector in St. Louis, Missouri, purchased the Painting from M. Knoedler & Co., on consignment from the Frank Perls Gallery, for $16,500.[4]

More than twenty years later, on November 18, 1976, Baron Hans–Heinrich Thyssen–Bornemisza of Lugano, Switzerland (the "Baron") purchased the Painting through New York art dealer Stephen Hahn for $275,000. The Painting was maintained as part of the Thyssen–Bornemisza Collection in Switzerland until 1992, except when on public display in exhibitions outside Switzerland.

In 1988, the Baron and Spain agreed that the Baron (through one of his entities, Favorita Trustees Limited) would loan his art collection (the "Collection"), including the Painting, to the Kingdom of Spain. Pursuant to the 1988 Loan Agreement, Spain established the Foundation, a nonprofit, private cultural foundation to maintain, conserve, publicly exhibit, and promote artwork from the Collection. The Spanish government agreed to display the Collection at the Villahermosa Palace in Madrid, Spain, which would be restored and redesigned for its new purpose as the Thyssen–Bornemisza Museum (the "Muse-

---

**2.** Because of the narrow focus of the parties' motions, the Court only discusses the undisputed facts relevant to its decision on the present motions. To the extent any of these facts are disputed, they are not material to the disposition of these motions. In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

**3.** The Court adopts Plaintiffs' preferred designation and refers to Lilly Cassirer Neubauer as "Lilly" in this Order.

**4.** Brody apparently only kept the Painting a few months before returning the painting to the Frank Perls Gallery for re-sale.

um"). On June 22, 1992, the Museum received the Painting, and, on October 10, 1992, opened to the public with the Painting on display.

Spain later sought to purchase the Collection. On June 18, 1993, the Spanish cabinet passed Real Decreto–Ley 11/1993, authorizing the government to sign a contract allowing the Foundation to purchase the 775 artworks that comprised the Collection. In accordance with Real Decreto–Ley 11/1993, on June 21, 1993, the Kingdom of Spain, the Foundation, and Favorita Trustees Limited entered into an Acquisition Agreement, by which Favorita Trustees Limited sold the Collection to the Foundation.[5] The Foundation's purchase of the Collection for $338 million was entirely funded by Spain.

The Painting has been on public display at the Foundation's Museum in Madrid, Spain since the Museum's opening on October 10, 1992, except when on public display in a 1996 exhibition outside of Spain and while on loan at the Caixa Forum in Barcelona, Spain from October 2013 to January 2014. Since the Foundation purchased the Painting in 1993, the Painting's location and the Foundation's "ownership" have been identified in several publications including: (1) Wivel, Mikael: Ordrupgaard. Selected Works. Copenhague, Ordrupgaard, 1993, p. 44; (2) Rosenblum,

Robert: "Impressionism. The City and Modern Life". En Impressionists in Town. [Cat. Exp.]. Copenhague, Ordrupgaard, 1996, n. 17, pp. 16–17, il. 61.; (3) Llorens, Tomas; Borobia, Mar y Alarcó, Paloma: Obras Maestras. Museo Thyssen–Bornemisza. Madrid, Fundación Collectión Thyssen–Bornemisza, 2000, p. 156, il. p. 157; and (4) Perez–Jofre, T.: Grandes obras de arte. Museo Thyssen–Bornemisza. Colonia, Tascnen, 2001, p. 540, il. p. 541. Declaration of Evelio Acevedo Carrero [Docket No. 249–2] at ¶ 18.

Neither Lilly nor any of her heirs attempted to locate the Painting between 1958 and late 1999, and Claude Cassirer, Lilly's heir, did not discover that the Painting was on display at the Museum until sometime in 2000. On May 3, 2001, he filed a Petition with the Kingdom of Spain and the Foundation, seeking return of the Painting. On May 10, 2005, after his Petition to return the Painting was rejected, Claude Cassirer filed this action against the Kingdom of Spain and the Foundation,[6] seeking the return of the Painting, or an award of damages in the event the Court is unable to order the return of the Painting. From 1980 to the time of his death on September 25, 2010, Claude Cassirer lived in California.

After extensive motion practice, including two appeals to the Ninth Circuit, the

---

**5.** In 1989 and 1993, in connection with the loan and ultimate purchase of the Collection, Spain and the Foundation commissioned an investigation of title to verify that the Baron and his relevant entities had clear and marketable title to the Collection. Plaintiffs claim that the investigation was incomplete and that Spain and the Foundation ignored red flags concerning the Painting's provenance, including, for example, that: (1) the Stephen Hahn Gallery had been affiliated with Nazi looting; (2) paintings by Pissarro were known to be the frequent subjects of Nazi looting; and (3) the back of the Painting has a "Berlin" label traceable to the Cassirer Gallery and the

provenance documentation provided no explanation for that label. However, this disputed issue as to the Foundation's alleged "bad faith" is not material or relevant to the Court's decision on these motions.

**6.** Unfortunately, Claude Cassirer died on September 25, 2010, and David Cassirer, Ava Cassirer, and United Jewish Federation of San Diego County were substituted as plaintiffs in this action. In addition, pursuant to the stipulation of the parties, the Kingdom of Spain was dismissed without prejudice in August 2011.

Foundation now moves for summary judgment on the grounds that: (1) under Swiss or Spanish law, the Foundation is the owner of the Painting; (2) California Code of Civil Procedure § 338(c), as amended in 2010, violates the Foundation's due process rights by retroactively depriving the Foundation of its vested property rights; and (3) Plaintiffs' claims are barred by laches. Plaintiffs move for summary adjudication, seeking an order declaring that the substantive law of the State of California governs, and that the law of Spain does not govern, the merits of this dispute.

## II. LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250, 106 S.Ct. 2505; Fed.R.Civ.P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue of fact is not enough to defeat summary judgment; there must

be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir.1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir.1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir.1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir.1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the non-moving party." *American International Group*, 926 F.2d at 836–37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir.1997).

## III. DISCUSSION

Based on the undisputed facts, the Court concludes that the Foundation is the owner of the Painting pursuant to Spain's laws governing adverse possession. Be-

cause the Court concludes that the Foundation acquired ownership of the Painting by adverse possession under Spanish law, it need not address whether the Baron acquired ownership of the Painting by adverse possession under Swiss law (and thus conveyed good title to the Foundation) or whether Plaintiffs' claims are barred by laches.

## A. Choice of Law

As an initial matter, the Court must determine whether California law or Spanish law governs the Foundation's claim that it acquired ownership of the Painting by adverse possession. In order to make this determination, the Court must first determine whether it should apply California or federal common law choice-of-law rules. *See Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir.1991). Where, as here, federal court jurisdiction is premised on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330, *et seq.*, the Ninth Circuit has held that federal common law choice-of-law rules govern. *See, e.g., Schoenberg*, 930 F.2d at 782. However, the Ninth Circuit recently called its holding into question in an en banc decision in *Sachs v. Republic of Austria*, 737 F.3d 584 (9th Cir.2013), stating that it may be permissible to apply the forum state's choice-of-law rules. *Id.* at 600 n. 14 (en banc), *cert. granted sub nom. OBB Personenverkehr AG v. Sachs*, — U.S. —, 135 S.Ct. 1172, 190 L.Ed.2d 929 (2015). Although the Ninth Circuit in *Sachs* did not overrule its prior case law, the Court, out of an abundance of caution, will conduct a choice-of-law analysis under both federal common law and California law.

### 1. Federal Common Law Choice-of-Law Rules

Federal common law follows the approach of the Restatement (Second) of Conflict of Laws (the "Restatement"). *See, e.g., Schoenberg*, 930 F.2d at 782. Restatement § 222 sets forth the general choice-of-law principle applicable to interests in both real and personal property:

> The interest of the parties in a thing are determined depending upon the circumstances, either by the "law" or by the "local law" of the state which, with respect to the particular issue, has the most significant relationship to the thing and the parties under the principles in § 6.

Restatement § 222. The factors relevant to the determination of which state has the most significant relationship to the "thing and the parties" are set forth in § 6, which include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement § 6. In addition to these general principles, the Restatement also provides specialized conflict of law rules for specific legal issues, that "courts have evolved in accommodation" of the factors in § 6. Restatement, § 6 (comment on Subsection (2)). Restatement § 246 sets forth the specialized conflict of law rule for a claim of "acquisition by adverse possession or prescription of interest in chattel":

Whether there has been a transfer of an interest in a chattel by adverse possession or by prescription and the nature of the interest transferred are determined by the local law of the state where the chattel was at the time the transfer is claimed to have taken place.

Restatement § 246. The Restatement's comment to this section provides the following rationale for this rule: "The state where a chattel is situated has the dominant interest in determining the circumstances under which an interest in the chattel will be transferred by adverse possession or by prescription. The local law of this state is applied to determine whether there has been such a transfer and the nature of the interest transferred." Restatement § 246, comment.

■ Applying the Restatement's principles and rules, the Court concludes that, under federal common law, the law of Spain governs the Foundation's claim that it acquired ownership of the Painting by adverse possession. The Court finds no reason to depart from the rule set forth in Restatement § 246, i.e., that the "local law of the state where the chattel was at the time the transfer is claimed to have taken place" should apply. In accordance with that rule, Spain has the dominant interest in determining the circumstances under which ownership of the Painting may be acquired by adverse possession or prescription. Indeed, "[i]n contrast to torts . . .; protection of the justified expectations of the parties is of considerable importance in the field of property" and "[t]he situs [of the property] . . . plays an important role in the determination of the law governing the transfer of interests in tangible . . . movables." Restatement § 222, comment. Applying the "local law of the state where the chattel was at the time the transfer is claimed to have taken place" facilitates simple identification of the applicable law

and leads to certainty, predictability, and uniformity of result. See Declaration of Professor Alfonso–Luis Calvo Caravaca [Docket No. 24924], Exhibit 50 at ¶ 5.

Moreover, in this case, the Painting has been in the possession of the Foundation, an instrumentality of the Kingdom of Spain, and it has been located in Madrid, Spain for more than twenty years. In contrast to Spain's significant relationship to the Painting and the Foundation, California's relationship to the Painting and the parties is limited to the following facts: (1) Claude Cassirer moved to California in 1980; (2) the Frank Perls Gallery in Beverly Hills, California arranged a sale of the Painting to Sydney Brody in Los Angeles, California in July 1951; and (3) less than a year later, in May 1952, the Frank Perls Gallery in Beverly Hills, California was involved in the sale of the Painting to Sydney Schoenberg in St. Louis, Missouri. Although Plaintiffs' relationship to California is significant, the Painting's relationship to California is not.

After balancing all of the factors (including the factors discussed *infra* under the California governmental interest test), the Court concludes that Spain has the most significant relationship to the Painting and the parties. Accordingly, the Court concludes that, under federal common law, the law of Spain governs the Foundation's claim of ownership by adverse possession.

### 2. *California Governmental Interest Test*

■ The Court also concludes that the application of California's choice-of-law rules leads to the same result, i.e., the law of Spain governs the Foundation's claim that it acquired ownership of the Painting by adverse possession. California applies the three-step "governmental interest" test to resolve choice-of-law issues:

First, the court determines whether the relevant law of each of the potentially

affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95, 107–108, 45 Cal.Rptr.3d 730, 137 P.3d 914 (2006) (quotations and citations omitted). "The party advocating the application of a foreign state's law bears the burden of identifying the conflict between that state's law and California's law on the issue, and establishing that the foreign state has an interest in having its law applied." *Pokorny v. Quixtar*, 601 F.3d 987, 995 (9th Cir.2010) (citing *Wash. Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906, 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (2001)).

### a. Spanish law differs from California law.

First, the Court concludes that the Spanish law differs from California law regarding the acquisition of personal property by adverse possession or prescription. California has not extended the doctrine of adverse possession to personal property.

*See San Francisco Credit Clearing House v. C.B. Wells*, 196 Cal. 701, 707–08, 239 P. 319 (1925); *Society of Cal. Pioneers v. Baker*, 43 Cal.App.4th 774, 784 n. 13, 50 Cal.Rptr.2d 865 ("The court in [*San Francisco Credit Clearing House v. Wells*, 196 Cal. 701, 707, 239 P. 319 (1925) ] suggested that the doctrine of adverse possession would not apply to personal property, and no California case has been cited in support of such an application.").[7] In contrast, Spain, as discussed *infra*, has adopted laws that expressly permit the acquisition of ownership of personal property by adverse possession (or acquisitive prescription or *usucapio* ). Spanish Civil Code Article 1955 provides in relevant part: "Ownership of movable property prescribes by three years of uninterrupted possession in good faith. Ownership of movable property also prescribes by six years of uninterrupted possession, without any other condition." *See* Declaration of Javier Martínez Bavíere [Docket No. 249–22] at ¶ 5, Exhibit 38.

### b. A true conflict exists.

Second, the Court concludes that a true conflict exists, i.e., each jurisdiction has an interest in having its own law applied.

■ "To assess whether either or both states have an interest in applying their policy to the case, we examine the governmental policies underlying each state's laws." *Scott v. Ford Motor Company*, 224 Cal.App.4th 1492, 1504, 169 Cal.Rptr.3d 823 (2014) (quotations and citations omitted). "In conducting this inquiry, we may make our own determination of the relevant policies and interest, without taking evidence as such on the matter." *Sullivan*

---

**7.** Even if California were to recognize the applicability of the doctrine of adverse possession to personal property, the elements of such a claim, and the time period necessary for a *possessor* to acquire ownership, would be significantly different than the elements and time period under Spanish law. *See* Cal. Civ.Code § 1006; Cal.Civ.Proc.Code § 338(c)(3).

*v. Oracle Corp.*, 51 Cal.4th 1191, 1203, 127 Cal.Rptr.3d 185, 254 P.3d 237 (2011) (quotations and citations omitted).

Generally, laws relating to adverse possession of personal property serve the important interests of certainty of title, protecting defendants from stale claims, and encouraging plaintiffs not to sleep on their rights. *See, e.g.*, Declaration of Carlos M. Vazquez in Support of Plaintiffs' Motion for Summary Adjudication, at Exhibit 510 [Docket No. 251–5]; Scottish Law Commission, Discussion Paper on Prescription and Title to Moveable Property, available at http://www.scotlawcom.gov.uk/files/5413/3666/0832/rep228.pdf. Spain unquestionably has an interest in serving these policy goals and applying its law of adverse possession to the Foundation's claim of ownership, especially given that the Foundation is an instrumentality of the Kingdom of Spain and the Painting has been located within its borders for over twenty years.

Likewise, California unquestionably has an interest in applying its law to this action. California's decision not to extend the doctrine of adverse possession to personal property recognizes the difficulties faced by owners in discovering the whereabouts of personal property even when held openly and notoriously, and serves to protect the interests of the "rightful owner" over subsequent possessors. It also serves to encourage subsequent purchasers to determine the true owner of property before purchasing that property. California's interest in serving these policy goals is especially strong in the context of stolen art. Indeed, in 2010, the California Legislature amended its general statute of limitations governing personal property— California Code of Civil Procedure § 338— to provide greater protections for the recovery of stolen art.[8] In amending the statute, the California Legislature expressly found and declared, in relevant part: (1) "California's interest in determining the rightful ownership of fine art is a matter of traditional state competence, responsibility, and concern;" (2) "Because objects of fine art often circulate in the private marketplace for many years before entering the collections of museums or galleries, existing statutes of limitation, which are solely the creatures of the Legislature, often present an inequitable procedural obstacle to recovery of these objects by parties that claim to be their rightful owner;" and (3) "The application of statutes of limitations ·and any affirmative defenses to actions for the recovery of works of fine art ... should provide incentives for research and publication of provenance information about these works, in order to encourage the prompt and fair resolution of claims." *See* 2010 Cal. Stat. ch. 691, § 1.

In addition, California has a legitimate interest in applying its laws governing per-

---

8. Specifically, California Code of Civil Procedure § 338, as amended, (1) retroactively extends the statute of limitations for specific recovery of a work of fine art from three to six years if the action is brought against a museum, gallery, auctioneer or dealer; and (2) clarifies that such claims do not accrue until "actual discovery" rather than "constructive discovery" of both the identity and whereabouts of the work and information supporting a claim of ownership. The amended statute also exempts claims for the specific recovery of a work of fine art from California's borrowing statute, California Code of Civil Procedure § 361, which directs California courts to borrow the statute of limitations or statute of repose of a foreign jurisdiction under certain circumstances. *See* Cal. Civ.Proc.Code § 361 ("When a cause of action has arisen ·in another State, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this State, except in favor of one who has been a citizen of this State, and who has held the cause of action from the time it accrued.").

sonal property to "rightful owners" who reside within its borders. *See, e.g., McCann v. Foster Wheeler LLC,* 48 Cal.4th 68, 95, 105 Cal.Rptr.3d 378, 225 P.3d 516 (2010) ("California has an interest in having this statute applied to a person, like plaintiff, who is a California resident at the time the person discovers that he or she is suffering from an asbestos-related injury or illness, even when the person's exposure to asbestos occurred outside California."); *Castro v. Budget Rent–A–Car System, Inc.,* 154 Cal.App.4th 1162, 1182, 65 Cal.Rptr.3d 430 (2007) ("California ... does have a legitimate governmental interest in having its ... statute applied based on Castro's status as a California resident."). Given that Claude Cassirer resided in California from 1980 until the time of his death in September 2010, discovered the whereabouts of the Painting while he was a resident of California, and filed this action while he was a resident of California, California clearly has in interest in the application of its laws concerning adverse possession and stolen art in this case.[9]

Accordingly, the Court concludes that each jurisdiction (Spain and California) has an interest in having its own laws apply.

**c. Spain's interest would be substantially more impaired if its policy were subordinated to the policy of California.**

Third, and finally, the Court concludes that Spain's interest would be substantially more impaired if its policy were subordinated to the policy of California.

Under the third step of California's governmental interest test, the Court must "carefully evaluate and compare the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *McCann v. Foster Wheeler LLC,* 48 Cal.4th 68, 96–97, 105 Cal.Rptr.3d 378, 225 P.3d 516 (2010) (quotations and citations omitted). In conducting this evaluation, the California Supreme Court has instructed:

> [I]t is important to keep in mind that the court does not "weigh" the conflicting governmental interests in the sense of determining which conflicting law manifested the "better" or the "worthier" social policy on the specific issue. An attempted balancing of conflicting state policies in that sense is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish. Instead, the process can accurately be described as a problem of allocating domains of law-making power in multi-state contexts—by determining the appropriate limitations on the reach of state policies—as distinguished from evaluating the wisdom of those policies. Emphasis is placed on the appropriate scope of conflicting state policies rather than on the "quality" of those policies.

*Id.* at 97, 105 Cal.Rptr.3d 378, 225 P.3d 516 (quotations and citations omitted). The emphasis, on the appropriate scope of conflicting policies, rather than on the quality of those policies, is equally as important, if not more important, in the context of international disputes. Moreover, "[a]lthough California no longer follows the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred *without regard to the nature*

---

9. The substituted Plaintiffs also have strong ties to California. *See* Declaration of David Cassirer in Support of Plaintiffs' Motion for Summary Adjudication [Docket No. 251–2] at ¶¶ 2–5, 11.

*of the issue that was* before the court, California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders, and in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future." *McCann*, 48 Cal.4th at 97–98, 105 Cal. Rptr.3d 378, 225 P.3d 516 (internal citations omitted).

In this case, the original unlawful taking of the Painting occurred in Germany from Plaintiffs' ancestor, Lilly, who, at the time, resided there. Although the Painting passed through California in 1951, it was present in California for less than a year before it was sent to Missouri. In contrast, the Painting was located in Switzerland for sixteen years and Spain for more than twenty years. Most importantly, the Painting has been in the possession of an instrumentality of the Kingdom of Spain in Madrid, Spain since 1992, and that possession in Spain provides the basis for the Foundation's claim of ownership. Spain has a strong interest in regulating conduct that occurs within its borders, and in being able to assure individuals and entities within its borders that, after they have possessed property uninterrupted for more than six years, their title and ownership of that property are certain.

If Spain's interest in the application of its law were subordinated to California's interest, it would rest solely on the fortuitous decision of Lilly's successor-in-interest to move to California long after the Painting was unlawfully taken by the Nazis and the fact that he happened to reside there at the time the Foundation took possession of the Painting. Subjecting a defendant within Spain to a different rule of law based on the unpredictable choice of residence of a successor-in-interest would significantly undermine Spain's interest in certainty of title. *Cf. McCann*, 48 Cal.4th at 98, 105 Cal.Rptr.3d 378, 225 P.3d 516 ("Because a commercial entity protected by the Oklahoma statute of repose has no way of knowing or controlling where a potential plaintiff may move in the future, subjecting such a defendant to a different rule of law based upon the law of a state to which a potential plaintiff ultimately may move would significantly undermine Oklahoma's interest in establishing a reliable rule of law governing a business's potential liability for conduct undertaken in Oklahoma.").

In contrast, if the Court applies Spanish law, the impairment of California's interest is significantly less based on the facts and circumstances of this case. Although California has a fundamental interest in protecting its residents and specifically has an interest in protecting its residents claiming to be rightful owners of stolen art, that interest is far less significant where the original victim did not reside in California, where the unlawful taking did not occur within its borders, and where the defendant and the entity from which the defendant purchased the property were not located in California. Moreover, California's interest in the application of its laws related to adverse possession of personal property (or lack thereof) is not as strong as Spain's interest, given that neither a California statute nor case law *expressly* prohibits a party from obtaining ownership of personal property through adverse possession. In contrast, Spain has enacted laws, as part of its Civil Code, that specifically and clearly govern adverse possession of movable property. Furthermore, although the California Legislature's 2010 amendment to California Code of Civil Procedure § 338 is certainly relevant to demonstrate

California's interest in protecting "rightful owners" of stolen art, the Court considers it significant that the California Legislature did *not* create a new claim for relief or attempt to statutorily restrict the Court's choice of substantive law in this area. Instead, the California Legislature merely expressed its interest in eliminating inequitable procedural obstacles to recovery of fine art by extending the statute of limitations for claims seeking such recovery. Unlike a statute of limitations, the law of adverse possession does not present a procedural obstacle, but rather concerns the *merits* of an aggrieved party's claim.

Accordingly, the Court concludes that, under the California governmental interest test as well as federal common law, Spanish law governs the Foundation's claim of ownership by adverse possession.[10]

### B. Under Spain's Laws of Adverse Possession, the Foundation is the Owner of the Painting.

██ The Court concludes that, based on the undisputed facts, the Foundation acquired ownership of the Painting by adverse possession (also known as *usucapio* or acquisitive prescription) under Spanish law.[11]

Spain's adverse possession laws regarding "movable property" require that the possessor: (1) possess the property for the statutory period, i.e. three years if in "good faith" ("ordinary adverse possession") or six years if in "bad faith" ("extraordinary adverse possession") (Spanish Civil Code Article 1955); (2) possess the property as owner (Article 1941), and (3) possess the property publicly, peacefully and without interruption (Articles 1941–1948).[12] *See* Declaration of Javier Martínez Baviere [Docket No. 249–22] at ¶ 5, Exhibit 38.

Plaintiffs do not seriously dispute that the Foundation has met the general requirements for extraordinary adverse possession (under the longer six-year period). Indeed, in their Opposition to the Foundation's Motion for Summary Judgment, Plaintiffs do not even address the Foundation's arguments that it possessed the Painting as owner publicly, peacefully, and without interruption for more than six years. Nonetheless, the Court will examine each required element.

#### 1. *Possession as Owner*

"Anyone who projects an external image of being the owner has *possession as owner*. The person may believe that he is the owner or know that he is not (this is a question of good faith or bad faith), but, even if a person knows that he is not the owner of what he bought (precisely be-

---

**10.** Under Spain's choice of law rules, ownership of the Painting is likewise governed by Spanish law. *See* Declaration of Professor Alfonso–Luis Calvo Caravaca [Docket No. 249–24], Exhibit 50 at ¶¶ 3–10; Spanish Civil Code Article 10.1.

**11.** Pursuant to Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rule of Evidence. The court's determination must be treated as a ruling on a question of law."

**12.** Generally, in order to validly transfer ownership under Spanish law, there must be: (1) "title," usually a contract evidencing the sale or exchange (in this case, the Acquisition Agreement dated June 21, 1993 by which Favorita Trustees Limited sold the Collection to the Foundation); and (2) a "mode" or "means," which is the transfer of possession in a variety of forms permitted by the law. *See* Declaration of Professor Alfonso–Luis Calvo Caravaca [Docket No. 249–24], Exhibit 50 at ¶¶ 10, 20–21. When the seller does not have ownership of the goods that he purports to sell, the buyer may obtain ownership through the "mode" of *usucapio* or adverse possession. *Id.*

cause he bought it from someone who was not the owner either), a person who performs acts relating to the asset which those that witness them will see as typical of ownership possesses said asset as the owner." Declaration of Professor Alfonso–Luis Calvo Caravaca [Docket No. 249–24], Exhibit 50 ("Foundation's Spanish Report") at ¶ 35; *see also* Isabel V. González Pacanowska & Carlos Manuel Díez Soto, *National Report on the Transfer of Movables in Spain, in National Report on the Transfer of Movables in Europe*, Volume 5: Sweden, Norway and Denmark, Finnland, Spain 393, 646 (Wolfgang Faber & Brigitta Lurger eds. 2011) ("[T]he requirement of possession in the capacity of owner does not relate to the internal intention of the subject, but external behaviour consistent with the character of being the actual owner.").

The Court concludes that the Foundation has possessed the Painting as owner since June 21, 1993, when it purchased the Painting from Favorita Trustees Limited, because it has projected an external image of ownership since that date. Indeed, the Foundation has publicly displayed the Painting in its Museum without any contrary indication of ownership, and loaned the Painting to others for public exhibition consistent with its claim of ownership.

### 2. *Possession of the Painting Publicly, Peacefully, and Without Interruption*

In addition, the Court concludes that the Foundation's possession of the Painting as owner has been "public, peaceful, and uninterrupted." Spanish Civil Code Article 1941.

First, the Court concludes that, under Spanish law, the Foundation's possession has been "public." "[T]he possessor must show by means of ostensible acts that he possesses the asset: without supreme effort but with reasonable and ongoing publicity, said reasonableness being considered based on the nature of use of the asset in question." Foundation's Spanish Report at ¶ 36. "The requirement of publicity regards not only possession as such, but also the capacity in which it is held, and is considered necessary so that the real owner has the possibility of defending his or her right against another's acts." González Pacanowska & Díez Soto, *supra*, at 647. "On the other hand, it is not necessary for the person claiming to be 'the real owner' to have full knowledge of third party possession, but such knowledge is at least possible for that person using average diligence." Foundation's Spanish Report at ¶ 36; *see also* Declaration of Alfredo Guerrero [Docket No. 279], Exhibit 55 ("Plaintiffs' Spanish Report") at p. 39 ("[I]t must be noted that a possession has public character when the actual owner would be able to have knowledge of such possession using a standard diligence although it does not have any knowledge in the reality."). In this case, the Painting has been on public display at the Museum from October 10, 1992 until the present (except when on public display in a 1996 exhibition outside of Spain and while on loan at the Caixa Forum in Barcelona, Spain from October 2013 to January 2014). Moreover, since the Foundation's purchase of the Painting in 1993, the Foundation's "ownership" and the Painting's location in Spain have been identified in the several publications including: (1) Wivel, Mikael: Ordrupgaard. Selected Works. Copenhague, Ordrupgaard, 1993, p. 44; (2) Rosenblum, Robert: "Impressionism. The City and Modern Life". En Impressionists in Town. [Cat. Exp.]. Copenhague, Ordrupgaard, 1996, n. 17, pp. 16–17, il. 61.; (3) Llorens, Tomas; Borobia, Mar y Alarcó, Paloma: Obras Maestras. Museo Thyssen–Bornemisza. Madrid, Fundación Collectión Thyssen–Bornemisza, 2000, p. 156,

il. p. 157; and (4) Perez–Jofre, T.: Grandes obras de arte. Museo Thyssen–Bornemisza. Colonia, Tascnen, 2001, p. 540, il. p. 541. Declaration of Evelio Acevedo Carrero [Docket No. 249–2] at ¶ 18. As a result, the Court concludes, as a matter of Spanish law, that the Foundation's possession was sufficiently public to satisfy this element of adverse possession. Indeed, as the Foundation's experts in Spanish law state, the permanent exhibition of the Painting at the Museum "is the best example of publicity imaginable in cases of items like the one in question. Precisely for a case of adverse possession of works of art, the Judgment of the Supreme Court of 28 November 2008 based the 'manifest publicity' on appearances in the press and public exhibitions." Foundation's Spanish Report at ¶ 36; *see also* STS 6657/2008, Nov. 28, 2008 (ECLI:ES:TS: 2008:6657).

Second, the Court concludes that the Foundation's possession as owner was "peaceful" from June 21, 1993 until at least May 3, 2001. Indeed, the Foundation acquired the Painting in a peaceful manner and possessed the Painting without any challenge or dispute as to its "ownership" until May 3, 2001 (when Claude Cassirer filed a Petition with the Kingdom of Spain and the Foundation, seeking return of the Painting).

Third, and finally, the Court concludes that the Foundation's possession as owner was "uninterrupted" from June 21, 1993 until at least May 3, 2001. Possession may be interrupted when: (1) for any reason, such possession should cease for more than one year; (2) as a result of the judicial summons to the possessor; (3) "an act of conciliation"; and (4) "[a]ny express or implied recognition by the possessor of the owner's right." Spanish Civil Code Articles 1943 to 1948. None of these events occurred during the time period between June 21, 1993 and May 3, 2001.

### 3. *Possession of the Property for the Statutory Period*

Spanish Civil Code Article 1955 provides in relevant part:

> Ownership of movable property prescribes by three years of uninterrupted possession in good faith. Ownership of movable property also prescribes by six years of uninterrupted possession, without any other condition....[13]

Declaration of Javier Martínez Baviere [Docket No. 249–22] at ¶ 5, Exhibit. 38. The Court finds it unnecessary to address whether the Foundation acquired ownership of the Painting under the shorter

---

**13.** Spanish Civil Code Article 1955 further provides: "The provisions of article 464 of this Code shall apply as related to the owner's right to claim movable property which has been lost or of which he has been unlawfully deprived .... " Declaration of Javier Martínez Baviere [Docket No. 249–22] at ¶ 5, Exhibit 38. Article 464 provides in relevant part: "Possession of movable property, acquired in good faith, is equivalent to title. Notwithstanding the foregoing, any person who has lost movable property or has been deprived of it illegally may claim it from its possessor." Declaration of Javier Martínez Baviere [Docket No. 249–22] at ¶ 5, Exhibit 31. Despite the language in Article 464, the Spanish Civil Code clearly contemplates, and both parties' Spanish law experts apparently agree, that a possessor of stolen or lost property can acquire ownership of that property by adverse possession under Article 1955. Indeed, the very next article of the Spanish Civil Code provides: "Movable property purloined or stolen may not prescribe in the possession of those who purloined or stole it, or their accomplices or accessories, *unless* the crime or misdemeanor or its sentence, and the action to claim civil liability arising therefrom, should have become barred by the statute of limitations." Spanish Civil Code Article 1956 (emphasis added) (Declaration of Javier Martínez Baviere [Docket No. 249–22] at ¶ 5, Exhibit 38).

three-year time period for ordinary adverse possession, because it concludes that, even if the Foundation acquired the Painting in "bad faith," i.e., knowing that there was a defect which invalidates its title or manner of acquisition (Spanish Civil Code Article 433), the Foundation acquired ownership under the longer six-year time period for extraordinary adverse possession. Indeed, as discussed *supra*, the Foundation has possessed the property as owner publicly, peacefully, and without interruption from at least June 21, 1993 until at least May 3, 2001.

As noted, Plaintiffs fail to argue that the Foundation has not satisfied these general requirements for adverse possession. Instead, Plaintiffs' *only* arguments in opposition to the Foundation's claim that it obtained ownership by extraordinary adverse possession are that: (1) Spanish Civil Code Article 1956 bars the application of adverse possession because the Foundation was an "accessory" to a crime against humanity or a crime against property in the event of armed conflict; and (2) Spain's adverse possession laws violate the European Convention on Human Rights. The Court addresses each of these arguments *infra*.

### 4. Spanish Civil Code Article 1956 is inapplicable.

Plaintiffs argue that, pursuant to Spanish Civil Code Article 1956, the Foundation cannot obtain ownership of the Painting by adverse possession because the Foundation was an "accessory" to a crime against humanity or a crime against property in the event of armed conflict.

Spanish Civil Code Article 1956 provides: "Movable property purloined or stolen may not prescribe in the possession of those who purloined or stole it, or their accomplices or accessories, unless the crime or misdemeanor·or its sentence, and the action to claim civil liability· arising therefrom, should have become barred by the statute of limitations." Spanish Civil Code Article 1956 (Declaration of Javier Martínez Baviere [Docket No. 249–22] at ¶ 5, Exhibit 38). In order for Article 1956 to bar the acquisition of ownership by adverse possession, three requirements must be satisfied: (1) there must be a crime of theft or robbery (or other similar crime relating to the misappropriation of movable property); (2) the possessor of the movable property must be a principal, accomplice, or accessory of the crime committed; and (3) the statute of limitations for the crime committed or for an action claiming civil liability arising from that crime must not have expired. Plaintiffs' Spanish Report at p. 45.

The parties agree that the looting of the Painting by Scheidwimmer and the Nazis constitutes a misappropriation crime for the purposes of Article 1956, and that, under the current Spanish Criminal Code, it would be considered a crime against humanity or crime against property in the event of armed conflict which has no statute of limitations.[14] However, in order for Article 1956 to have any application, the Foundation must also be a principal, accomplice, or accessory to the crime committed. In other words, the Foundation must be "criminally responsible" for the offense committed by the Nazis in looting the Painting. *See* 1973 Spanish Criminal Code Article 12 ("Those criminally responsible for felonies and misdemeanours are the following: 1. Principals. 2. Accomplices. 3. Accessories."). It is undisputed

---

**14.** The parties disagree as to whether the statute of limitations (or, more accurately, lack thereof) can be applied retroactively to crimes committed prior to the effective date of the current Spanish Criminal Code. The Court finds it unnecessary to resolve this question, because it concludes that Article 1956 is inapplicable on other grounds.

that the Foundation was not a "principal" or "accomplice" to the crime committed by the Nazis. Accordingly, the Court will only address whether the Foundation can be considered an "accessory" to the crime committed by the Nazis under Spanish law.

Assuming the facts in the light most favorable to Plaintiffs, the Court concludes, as a matter of Spanish law, that the Foundation was not an "accessory" to the crime committed by the Nazis. Under the 1973 Spanish Criminal Code, in effect at the time the Foundation acquired the Painting, "accessories" (or accessories after the fact) were defined as follows:

> Accessories are those who, aware of the perpetration of a punishable offence, without having had involvement in it as principals or accomplices, are involved subsequent to its execution in any of the following ways:
>
> 1. Aiding and abetting the principals or accomplices to benefit from the felony or misdemeanour.
>
> 2. Hiding or destroying the evidence, effects or instruments of the felony or misdemeanour, to prevent it being discovered.
>
> 3. Harbouring, concealing or aiding the escape of suspected criminals, when-

ever any of the following circumstances concur:

> One. When the accessory has acted in abuse of his public functions.
>
> Two. When the principal has committed the offences of treason, murder of the head of State or his successor, parricide, murder, unlawful detention for ransom or imposing any other condition, unlawful detention with simulation of public functions, deposit of weapons or ammunition, possession of explosives and criminal damage.

1973 Spanish Civil Code Article 17 (Declaration of Adriana De Buerba [Docket No. 289–1] at Exhibit 111A).[15]

Plaintiffs argue that the Foundation was an "accessory" to the looting of the Painting by Scheidwimmer and the Nazis, because the Foundation hid the evidence, effects or instruments of the crime "to prevent it being discovered." However, as the clear and unambiguous language of the Spanish Criminal Code provides, and as the relevant Spanish case law holds, the intent or purpose of the accessory's misconduct must be to prevent the offense or crime from being discovered. See 1973 Spanish Criminal Code Article 17 (emphasis added) ("Accessories are those who, aware of the perpetration of a punishable offence, without having had involvement in

---

15. Under the current Spanish Criminal Code, "accessories," as defined in the 1973 Spanish Criminal Code, are no longer considered "criminally responsible" for the original criminal offense. Rather, similar participation or involvement subsequent to the execution of the original offense is now defined as an independent criminal offense, i.e., "covering up," which is defined in Article 451. Article 451 provides in relevant part:

> Whoever has knowledge of a felony committed and, without having intervened in it as a principal, subsequently intervenes in its execution, in any of the following manners, shall be punished with a sentence of imprisonment of six months to three years:

> 1. Aiding the principals or accomplices to benefit from the gains, product or price of the offence, without intended personal profit;
>
> 2. Hiding, altering or destroying the evidence, effects or instruments of an offence, to prevent it being discovered;
>
> 3. Aiding the suspected criminals to avoid investigation by the authority or its agents, or to escape search or capture, whenever any of the following circumstances concur . . .

Spanish Criminal Code Article 451 (Declaration of Adrian De Buerba [Docket No. 289–1] at Exhibit 111B).

it as principals or accomplices, are involved subsequent to its execution in ... [h]iding or destroying the evidence, effects or instruments of the felony or misdemeanour, *to prevent it being discovered.*"); Declaration of Adriana De Buerba [Docket No. 289–1], Exhibit 111 ("De Buerba Expert Report") at ¶ 4 (translation of Judgment of the Spanish Supreme Court no. 62/2013, January 29, 2013) ("The action must have an impact on the evidence, effects or instruments of the criminal offence and the intent of these misconducts must be to prevent the criminal offence or its relevant legal aspects from being discovered.").[16]  In this case, there is absolutely no evidence that the Foundation purchased the Painting (or performed any subsequent acts) with the intent of preventing Scheidwimmer's or the Nazis' criminal offenses from being discovered. Indeed, Scheidwimmer had already been convicted and sentenced after the war, and the 1939 forced sale had already been the subject of civil proceedings in Germany from 1948 to 1958 in which both Lilly and Scheidwimmer were parties. *See* Declaration of Jonathan Petropoulos [Docket No. 277], Exhibit 71, at ¶¶ 55–56; Court's Order Denying Thyssen–Bornemisza Collection Foundation's Motion for Summary Adjudication filed on March 13, 2015 [Docket No. 245].

Contrary to the clear definition of "accessory" in the Spanish Criminal Code, Plaintiffs' Spanish legal expert, Alfredo Guerrero Righetto, creatively opines that one who has committed the independent crime of receiving stolen property is "included within" the concept of an "accessory". Supplemental Declaration of Alfredo Guerrero [Docket 298–1], Exhibit 1 at 7. The Court disagrees. As clearly explained by the Foundation's expert in Spanish criminal law, the receipt of stolen goods is an independent crime, and one who commits that crime is not necessarily "criminally responsible" for the previous crime perpetrated by others as an "accessory".[17] De Buerba Expert Report at ¶¶ 21–26.

Because the Foundation was not an accessory to the crimes committed by Scheidwimmer and the Nazis, as defined in the Spanish Criminal Code, the Court concludes that Article 1956 of the Spanish Civil Code is inapplicable.

**16.** The Court rejects the contrary conclusion reached by Plaintiffs' Spanish legal expert, Alfredo Guerrero Righetto. In his initial declaration filed on April 20, 2015 [Docket No. 279], he relied on the following inaccurate translation of Spanish Criminal Code Article 451: "Those who with knowledge of the commission of a crime and without having participated in it as a perpetrator or accomplice, intervene after execution of any of the following ways ... concealing, altering or disabling the body, effects or instruments of a crime, to prevent *their detection*". In contrast, the official translation by the Spanish Ministry of Justice provides: "Whoever has knowledge of a felony committed and, without having intervened in it as a principal, subsequently intervenes in its execution, in any of the following manners ... [h]iding, altering or destroying the evidence, effects or instruments of an offence, to prevent *it* being discovered." Guerrero Righetto's inaccurate translation results in his erroneous opinion that the Foundation is an "accessory" to the Nazis' crime, because he believes that the intent of the misconduct under Article 451 must be to prevent the evidence, effects or instruments of the offense from being discovered rather than to prevent the criminal offense itself from being discovered. Although Mr. Guerrero Righetto adheres to his opinion in his Supplemental Declaration filed on May 11, 2015 [Docket No. 298–1] even after his translation error was pointed out by the Foundation's expert, the Court, after conducting its own research, concludes that his interpretation of Article 451 (and Article 17 in the 1973 Spanish Criminal Code) is plainly wrong.

**17.** It does not appear, nor do the parties argue, that the crime of receiving stolen property is itself a misappropriation crime covered by Article 1956.

### 5. Spain's Adverse Possession Laws Do Not Violate the European Convention on Human Rights

Lastly, Plaintiffs, in an effort to avoid summary judgment, urge the Court to take the unprecedented and drastic step of invalidating Spain's adverse possession laws under Article 1 of Protocol No. 1 of the European Convention on Human Rights. Although Plaintiffs devote less than half of a page in their Opposition to this argument, the Court concludes that it is appropriate to address this argument.

Spain is a party to the European Convention on Human Rights, including its Protocol No. 1. Article 1 of Protocol No. 1 provides:

> Every natural or legal person is entitled to the peaceful enjoyment of his possessions. No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law.
>
> The preceding provisions shall not, however, in any way impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties.

As the European Court of Human Rights summarized:

> Article 1 of Protocol No. 1, which guarantees the right to the protection of property, contains three distinct rules: "the first rule, set out in the first sentence of the first paragraph, is of a general nature and enunciates the principle of the peaceful enjoyment of property; the second rule, contained in the second sentence of the first paragraph, covers deprivation of possessions and subjects it to certain conditions; the third rule, stated in the second paragraph, recognises that the Contracting States are entitled, amongst other things, to control the use of property in accordance with the general interest . . . The three rules are not, however, 'distinct' in the sense of being unconnected. The second and third rules are concerned with particular instances of interference with the right to peaceful enjoyment of property and should therefore be construed in the light of the general principle enunciated in the first rule."

*Case of J.A. Pye (Oxford) Ltd and J.A. Pye (Oxford) Land Ltd v. The United Kingdom*, no. 44302/02 (/sites/eng/pages/search.aspx# {"appno":["44302/02"]}), § 52, ECHR 30 August 2007 (hereinafter "*Pye*") (citations omitted). "In order to be compatible with the general rule set forth in the first sentence of the first paragraph of Article 1, an interference with the right to the peaceful enjoyment of possessions must strike a 'fair balance' between the demands of the general interest of the community and the requirements of the protection of the individual's fundamental rights." *Id.* at § 53 (citations omitted). "In respect of interferences which fall under the second paragraph of Article 1 of Protocol No. 1, with its specific reference to 'the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest . . .', there must also exist a reasonable relationship of proportionality between the means employed and the aim sought to be realised. In this respect, States enjoy a wide margin of appreciation with regard both to choosing the means of enforcement and to ascertaining whether the consequences of enforcement are justified in the general interest for the purpose of achieving the object of the law in question." *Id.* at § 55.

In *Pye*, the European Court of Human Rights held that the English adverse possession law applicable to land did not vio-

late Article 1 of Protocol No. 1 of the European Convention on Human Rights. Specifically, it held in relevant part: (1) the loss of ownership pursuant to a generally applicable English land law was properly characterized as a "control of use" of land within the meaning of the second paragraph of Article 1, rather than a "deprivation of possessions" within the meaning of the second sentence of the first paragraph of Article 1; (2) the law pursued a legitimate aim in the general interest; and (3) the law struck a fair balance between the general interest of the community and the requirements of the protection of the individual's fundamental rights, and there existed a reasonable relationship of proportionality between the means employed and the aim sought to be realized. *Id.* at §§ 64–84.

■ The Court likewise concludes that Spain's laws of adverse possession do not violate Article 1 of Protocol No. 1 of the European Convention on Human Rights. "It is characteristic of property that different countries regulate its use and transfer in a variety of ways. The relevant rules reflect social policies against the background of the local conception of the importance and role of property." *Id.* at § 74. As discussed above, Spain's adverse possession laws serve the legitimate interests of certainty of title, protecting defendants from stale claims, and encouraging plaintiffs not to sleep on their rights. Moreover, in determining that a fair balance exists, the Court recognizes that Spain enjoys a "wide margin of appreciation," with regard both to choosing the means of enforcement and to ascertaining whether the consequences of enforcement are justified in the general interest for the purpose of achieving the object of the law in question. Spain's adverse possession laws are long-standing, generally applicable laws, which fall within Spain's margin

of appreciation, "unless they give rise to results which are so anomalous as to render the legislation unacceptable." *Id.* at § 83. The Court concludes that the results are not so anomalous as to render Spain's laws of adverse possession unacceptable.

Accordingly, the Court concludes that, under Spain's adverse possession laws, the Foundation acquired ownership of the Painting as of June 21, 1999, six years after it purchased the Painting from the Baron.

## C. To the Extent that Amended California Code of Civil Procedure § 338(c) Would Result in Depriving the Foundation of its Ownership of the Painting, It Violates the Foundation's Due Process Rights.

■ The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *see also Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). As the Supreme Court stated in *Campbell v. Holt*:

It may ... very well be held that in an action to recover real or personal property, where the question is as to the removal of the bar of the statute of limitations by a legislative act passed after the bar has become perfect, that such act deprives the party of his property without due process of law. The reason is that, by the law in existence before the repealing act, the property had become the defendant's. Both the

legal title and the real ownership had become vested in him, and to give the act the effect of transferring this title to plaintiff would be to deprive him of his property without due process of law. *Campbell v. Holt*, 115 U.S. 620, 623, 6 S.Ct. 209, 29 L.Ed. 483 (1885).

■ In this case, the Court has concluded that the Foundation acquired ownership of the Painting under Spanish law prior to California Legislature's retroactive extension of the statute of limitations in 2010. Moreover, it is undisputed that, before the California Legislature retroactively extended the statute of limitations in 2010, Plaintiffs' claims were time-barred under the prior version of California Code of Civil Procedure § 338. Accordingly, to the extent that application of amended California Code of Civil Procedure § 338(c) would result in depriving the Foundation of its ownership of the Painting, the statute violates the Foundation's due process rights.[18] Indeed, there is no persuasive argument that the statute is narrowly tailored to serve a compelling state interest.

## IV. CONCLUSION

For the foregoing reasons, the Foundation's Motion for Summary Judgment is **GRANTED**. Plaintiffs' Motion for Summary Adjudication Re Choice of California Law is **DENIED**. The parties are ordered to meet and confer and prepare a joint proposed Judgment which is consistent with this Order. The parties shall lodge the joint proposed Judgment with the Court on or before June 11, 2015. In the unlikely event that counsel are unable to agree upon a joint proposed Judgment,

the parties shall each submit separate versions of a proposed Judgment along with a declaration outlining their objections to the opposing party's version no later than June 11, 2015.

Although the Foundation has now prevailed in this prolonged and bitterly contested litigation, the Court recommends that, before the next phase of litigation commences in the Ninth Circuit, the Foundation pause, reflect, and consider whether it would be appropriate to work towards a mutually-agreeable resolution of this action, in light of Spain's acceptance of the Washington Conference Principles and the Terezin Declaration, and, specifically, its commitment to achieve "just and fair solutions" for victims of Nazi persecution.

IT IS SO ORDERED.

---

**18.** In any event, under California law, it does not appear that the retroactive extension of the statute of limitations would result in depriving the Foundation of ownership of the Painting. *See, e.g., In re Marriage of Klug*, 130 Cal.App.4th 1389, 1399, 31 Cal.Rptr.3d

327 (2005) ("Statutes of limitation are legislative enactments that limit the time period in which a plaintiff can bring his or her cause of action in court. They do not alter the legal obligation and injury underlying plaintiff's claim.").